727 F.2d 141
 33 Fair Empl.Prac.Cas. 1700,
33 Empl. Prac. Dec. P 34,149
Lorraine Le BEAU, et al., and Equal Employment Opportunity
Commission, Appellants,
v.
LIBBEY-OWENS-FORD COMPANY, and Local 19, United Glass and
Ceramic Workers, Appellees.
 Nos. 82-1858, 82-1868, 82-1932 and 82-1933.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 24, 1983.
Decided Feb. 3, 1984.
 
 1
 Barbara Lipsky, E.E.O.C., Washington, D.C., for appellants.
 
 
 2
 Charles J. Griffin, Jr., Matkov, Griffin, Parsons & Salzman & Madoff, Terrence E. Kiwala, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for appellees.
 
 
 3
 Before CUMMINGS, Chief Judge, ESCHBACH, Circuit Judge, and WYATT, Senior District Judge.*
 
 
 4
 WYATT, Senior District Judge.
 
 
 5
 These are four appeals in an action for claimed sex discrimination brought by women employees under Title VII of the Civil Rights Act of 1964 (42 U.S.C. Sec. 2000e and following).
 
 
 6
 One appeal (82-1868) is by plaintiff Le Beau and other individual women plaintiffs and by plaintiff Moriarity as representative of a class of women plaintiffs. Another appeal (82-1858) is by plaintiff-intervenor Equal Employment Opportunity Commission ("EEOC"). These two appeals are from the final judgment of the District Court. A third appeal (82-1932) is by defendant Libbey-Owens-Ford Company ("LOF"). The fourth appeal (82-1933) is by defendant Local 19, United Glass and Ceramic Workers ("Local 19"). These last two appeals are, according to the notices of appeal, simply from the final judgment of the District Court. It is explained in the briefs, however, that these two appeals are really cross-appeals which seek review of an order of the District Court, filed June 27, 1975, granting a motion by EEOC for leave to intervene as a plaintiff.
 
 
 7
 The action was brought by Le Beau and other female employees of LOF at its two plants in Ottawa, Illinois. The defendants were LOF, Local 19, and United Glass and Ceramic Workers of North America AFL-CIO-CLC (the "International Union") with which Local 19 was affiliated. The claim was that defendants had violated Title VII by discriminating against plaintiffs in that women at the Ottawa, Illinois plants of LOF were, by agreements with, or acquiescence of, the Unions, restricted to employment within two departments, were placed on sex-segregated seniority lists, and were subject to a separate system of assignment, lay-off, and recall. Plaintiffs sought injunctive relief and back pay.
 
 
 8
 The complaint was dismissed as against the International Union by order filed June 30, 1972. The dismissal was affirmed by this Court on July 17, 1973, on the ground that the International Union had not been named in the charge filed with EEOC (484 F.2d 798).
 
 
 9
 By order filed June 27, 1975, EEOC was granted leave by the District Court to intervene in the action as a plaintiff.
 
 
 10
 As an equity case, there was a trial without a jury before the District Court (Parsons, District Judge) between October 6 and November 11, 1981. The District Court filed its memorandum opinion and order on April 6, 1982 (the memorandum opinion and order was dated March 31, 1982). The District Court found for the individual plaintiffs and the class on the issue of liability but found for defendants "on the question of back wages", denying any back wages. The District Court found "in favor of the defendants and against the E.E.O.C. on all issues". A judgment, separate from the order and opinion, was filed and entered on April 6, 1982. There followed these appeals, of which this Court has jurisdiction under 28 U.S.C. Sec. 1291.
 
 
 11
 On the appeal of plaintiffs and a class representative and on the appeal of EEOC, we affirm the judgment below.
 
 
 12
 On the appeals (cross-appeals) of LOF and Local 19, we affirm the order of the District Court, filed June 27, 1975, granting a motion by EEOC for leave to intervene as a plaintiff.
 
 1.
 
 13
 Some of the relevant facts, as shown by the evidence and by the District Court's findings, may be related in chronological order.
 
 
 14
 Beginning in 1909, Illinois had in force a law, usually called the Illinois Female Employment Act, Sec. 5 (Ill.Rev.Stat., ch. 48, Sec. 25 and following; "the Act"). This provided that women could not be employed in work such as that of LOF at Ottawa for more than eight hours in any one day nor more than forty-eight hours in any one week. The Act had criminal penalties and was (except in wartime) enforced.
 
 
 15
 LOF, shortly after 1930, began making glass for automobiles at its two plants in Ottawa, Illinois.
 
 
 16
 Beginning in 1935, Local 19 and its International Union were the bargaining representatives of the production workers (both male and female) at Ottawa.
 
 
 17
 From the first, LOF employed women at Ottawa in its production activities (with which this action is solely concerned), as well as in clerical and other traditional "white collar" work. But LOF at all times obeyed the Illinois employment laws against overtime for females. Production of glass by its nature requires a certain amount of overtime. This is apparently because some operations require much more time than others; in order to keep production steady, some operations therefore must be continuous while others need not be; this situation is referred to as "balancing". In order to comply with the Act, women employed full-time were assigned by LOF to work in non-continuous operations, where overtime was less frequently required because operations could be stopped or speeded up as necessity dictated. Overtime was avoided in those operations also by hiring part-time women employees, listing them on an "extra board" in order of seniority, and calling them in for work if replacements (for absentees) or extra production were needed. When called in, part-time women employees had an absolute right of refusal and often exercised that right. Full-time women employees were hired in order of seniority from those on the extra board who wanted full-time work. Under this system LOF was able to employ women and, despite the nature of its production, was able at the same time to comply with the Illinois law against overtime for women. As will appear, the women themselves liked the system and not all of them wanted full-time jobs.
 
 
 18
 During World War II, while the men served military duty, glass production at LOF Ottawa ceased and production turned to aircraft defense material. The Act was suspended by the Illinois legislature in 1937, women moved to all production operations at LOF Ottawa, and the extra board system was discontinued.
 
 
 19
 After World War II and the return of the men from military duty, LOF Ottawa resumed the making of automobile glass. The non-continuous operations were concentrated in the Plastics and the Assembly Departments. The women were transferred and thereafter assigned only to these two departments, this in order to comply with the Illinois Female Employment Act which entered again into force. The pre-war extra board procedure for part-time women employees was resumed.
 
 
 20
 The restriction of women to the two described departments, the use of women for part-time work, and the extra board system as a whole were means of employing women at LOF without violating the Illinois laws against overtime for women. There was testimony (T 3186-87; "T" references are to pages of the trial transcript) that the system was costly to LOF, in part at least because LOF was required to pay fringe benefits for the many women workers who were not full-time. The labor unions approved, acquiesced in, and agreed to the extra board system as followed by LOF.
 
 
 21
 Title VII became effective on July 2, 1965 and the extra board system at LOF Ottawa, treating women differently from men because of the Illinois Act against overtime for women, became suspect.
 
 
 22
 LOF was completely aware of Title VII and of its possible effect on sex discrimination in states with conflicting requirements. These conflicts did cause confusion and uncertainty as LOF studied how to comply with Title VII. LOF in this connection took note of the exception in Title VII (Section 703(e)) for employment where sex is "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business ...". LOF took further note that Title VII (Section 713(b)) contained a defense to liability for violations where it was pleaded and proved that the violation was in "good faith ... reliance on any written interpretation or opinion" of EEOC.
 
 
 23
 LOF advised its personnel managers, before the effective date of Title VII, that it would comply with Title VII but that it was "in the dark" about how it would be administered, and would have to proceed "carefully" until "guidelines are established as to the meaning of non-discrimination because of sex."
 
 
 24
 EEOC did issue guidelines on sex discrimination in November 1965; these were published in the Federal Register on December 2, 1965 (30 Fed.Reg. 14926). As so published, they referred to such conflicts as those between Title VII and the Illinois female overtime laws as "[p]robably the most difficult area considered ...". They stated that it could not be assumed that "Congress intended to strike down such legislation". They stated further that state laws for the protection of women would be considered by EEOC "as a basis for application of the bona fide occupational qualification exception". While there were some reservations and qualifications in the guidelines as published in the Federal Register, their text, as issued with a press release by EEOC on November 22, 1965, stated that laws of the various states to protect women against "exploitation and hazard" would be considered by EEOC as "bona fide occupational qualifications and thus not in conflict with Title VII".
 
 
 25
 After the effective date of Title VII and the November 1965 EEOC guidelines, LOF continued its extra board practices for women employees at Ottawa, believing that in complying with Illinois law it was not in violation of Title VII.
 
 
 26
 Where LOF had plants in a state without laws against overtime for women, LOF made no distinction between men and women in hiring for production work and no extra board system was used. For example, this was true in Iowa where LOF had a plant in Mason City and where there were no laws against overtime for women.
 
 
 27
 Illinois, after the effective date of Title VII, continued to enforce its Female Employment Act to the knowledge of LOF. As late as January 1969, LOF asked the Illinois Department of Labor for permission to require a female office employee to work overtime. The request was denied on February 5, 1969, with the comments, among others, that Title VII was not intended "to disturb any State laws limiting the hours of employment for women" and that "we continue to enforce this labor statute."
 
 
 28
 On August 15, 1969, however, EEOC reversed its position as to state laws against overtime for women and amended its guidelines so as to find that such laws conflict with Title VII and cannot be the basis for the bona fide occupational qualification exception to Title VII. The new and reversed guidelines were published in the Federal Register on August 19, 1969 (34 Fed.Reg. 13367).
 
 
 29
 LOF promptly began to take steps to eliminate sex discrimination in Illinois and other states where this had been continued after Title VII because of state laws protective of women and in reliance on the 1965 EEOC guidelines. This change by LOF could not be made at once. There had to be studies of the several states where plants were located, new procedures had to be worked out where needed, the labor unions had to be consulted, and new labor agreements had to be drawn up and executed for locations affected. This process was completed for the Ottawa plants on March 5, 1970. After that date, women and men at Ottawa were hired on exactly the same basis, women were hired for work of any kind in production, and there was no extra board system.
 
 
 30
 It is without dispute in this case that there was no sex discrimination at the Ottawa plants of LOF for any period after March 5, 1970. It is also without dispute that before March 1970, there had never been any complaint by any woman about sex employment practices of LOF at Ottawa, about any claimed sex discrimination, about assignment to part-time work, about use of the extra board, or about any other matter included in this action. There was no grievance filed through the normal methods for handling claimed mistreatment. There was never any request by any woman for transfer from her assigned work to some other department of production. So far as LOF could tell, its women employees were entirely satisfied with working conditions at the Ottawa plants.
 
 2.
 
 31
 Although the claimed sex discrimination had been practiced without protest for several years after the effective date of Title VII, it was not until after such discrimination had wholly ceased on March 5, 1970, that a charge was filed with EEOC.
 
 
 32
 On March 16, 1970, plaintiff Le Beau and a number of other women employees of LOF Ottawa filed a charge with EEOC covering the matters here in suit.
 
 
 33
 Under date of July 7, 1971, EEOC sent notice to Le Beau of her right to sue (pursuant to section 706(e) of Title VII).
 
 
 34
 On August 3, 1971, the complaint was filed in the District Court. Le Beau and a number of other women employees were plaintiffs, for themselves and for a class. The defendants were LOF, Local 19, and the International Union. The complaint seems to recognize that the claimed discriminatory practices had in fact ceased; there is an averment that the defendants "continue such practices until the present time, as the residual effects of said discrimination have remained virtually unchanged" (emphasis supplied). The relief sought was an injunction restraining discriminatory conduct and a mandatory injunction directing back pay and other benefits.
 
 
 35
 The International Union moved to dismiss the action as against it, primarily because it had not been named as respondent in the charge filed by plaintiff Le Beau with EEOC on March 16, 1970. The District Court granted the motion by order filed June 30, 1972. LOF and Local 19 then moved to dismiss the action as to them on the ground that the International Union was an indispensable party (Fed.R.Civ.P. 19). The District Court granted this motion by order filed October 3, 1972. Plaintiffs then appealed from the two orders of dismissal and on July 17, 1973, this Court handed down its opinion and decision (484 F.2d 798). The order dismissing the International Union was affirmed. The order dismissing LOF and Local 19 was reversed on the ground that they would suffer no practical prejudice by an adjudication in the absence of the International Union. The action was remanded and continued against LOF and Local 19.
 
 
 36
 On December 6, 1973, Local 19 made a demand for trial by jury. Plaintiffs moved to strike this demand. The motion was granted and the jury demand stricken by order filed June 25, 1974, on the ground that there is no right to a jury trial where equitable relief is demanded.
 
 
 37
 The several plaintiffs moved, among other things, that the Court find "that the scope and membership of the class are as defined in the ... complaint". The District Court by order filed June 17, 1974 granted this motion and in its order described the class as consisting of "all female employees paid on an hourly basis who were employed or had recall rights on July 2, 1965 or who are now employed at LOF" (Record, Doc. 83).
 
 
 38
 About a year later, the defendants moved the Court to reconsider the definition of the class. The Court, by order filed May 16, 1975, granted the motion, stating that:
 
 
 39
 [T]he class in this case should include all hourly paid female employees either (1) who are now employed by LOF or who now have recall rights with LOF; (2) who were employed by LOF on July 2, 1965 or who have recall rights on that date, and who were not finally terminated from LOF's employ prior to December 16, 1969; or (3) who were employed by LOF after July 2, 1965, yet who were not finally terminated from LOF's employ prior to December 16, 1969. (Record, Doc. 115).
 
 
 40
 On May 20, 1975, EEOC filed a motion for leave to intervene as a party plaintiff in order to file a complaint as intervenor; the motion was said to be under Fed.R.Civ.P. 24(b)(1) and (2) and Sections 705(g)(6) and 706(f)(1) of Title VII; a proposed complaint was part of the moving papers. The proposed complaint set out substantially the same claimed discrimination as charged by the private plaintiffs. The relief sought was an injunction against future such conduct, an order to institute affirmative action programs, and an order directing back pay to the private plaintiffs and class members. We do not find the papers in opposition to this motion in the record. Apparently, defendants did not raise in opposition the point that the statutory authority permitting EEOC to intervene was limited to actions "pending" before EEOC on March 24, 1972. By order filed June 27, 1975, the motion of EEOC to intervene was granted.
 
 
 41
 More than three years later, on October 10, 1978, LOF filed a motion to dismiss the EEOC as plaintiff-intervenor. The ground asserted was that since injunctive relief was no longer sought, the EEOC no longer represented a "general public interest" distinct from that of the private plaintiffs. This motion was denied. Subsequently, on July 3, 1979, more than four years after EEOC had been allowed to intervene, LOF filed a motion for "reconsideration" of its motion to dismiss EEOC and for the first time raised the point that Le Beau's complaint had not been "pending" before EEOC as of March 24, 1972 so that the statutory grant of permissive intervention by EEOC could not apply to this action. This motion was denied by an order of the District Court filed on October 22, 1979 (Record, Doc. 384).
 
 
 42
 The non-jury trial was held from October 6 through November 11, 1981. On April 6, 1982, Judge Parsons filed a "memorandum opinion and order" which was dated March 31, 1982. On the same date a separate judgment was entered.
 
 
 43
 The decision of the District Court was in favor of the "individual plaintiffs" (which, it seems clear, is meant to include them as representatives of the class) "on the question of liability" but "in favor of the defendants on the question of back wages". The decision was in favor of defendants against EEOC on all issues.
 
 
 44
 These four appeals followed.3.
 
 
 45
 On the virtually undisputed facts shown in the record and found by the District Court, the essential issue on the appeals of plaintiffs and EEOC is whether the District Court was correct in denying back pay to plaintiffs and their class.
 
 
 46
 There were set out in the opinion below three reasons for denial of back pay.
 
 
 47
 The first reason was the provision in Section 713(b) of Title VII that no person "shall be subject to any liability" for violating Title VII "if he pleads and proves that the act or omission complained of was in good faith, in conformity with, and in reliance on any written interpretation or opinion of the Commission". The District Court found that defendants' acts were in good faith, in conformity with, and in reliance on the 1965 guidelines of EEOC (op. 22, 23, 28, 29, 30; "op." references are to pages of the District Court's unpublished opinion as reproduced in the appendix submitted by plaintiffs and EEOC jointly). In view of the wording of Title VII that there shall be no "liability" in the circumstances, we think that the District Court was probably mistaken in entering judgment for plaintiffs on the issue of "liability", but this is a matter more of form than of substance.
 
 
 48
 The second reason was the unresolved conflict between the Illinois Act and Title VII as to overtime for women. Since defendants were on the "horns of a dilemma", they could not be liable for a violation of Title VII if their acts were in a good faith effort to comply with the Illinois Act (op. 16-20, 30).
 
 
 49
 The third reason was that EEOC is equitably estopped from claiming that defendants violated Title VII and the private plaintiffs "are equitably estopped from asking damages, in the form of claimed back wages or any other form" (op. 30-31).
 
 4.
 
 50
 The argument for appellants in respect of reliance by LOF on the EEOC 1965 guidelines (Brief, pp. 38-49) is: (a) that the 1965 guidelines did not authorize, but prohibited, the practices of LOF which were adopted long before Title VII as a means of avoiding violation of the Illinois law against overtime by its women employees, and (b) that defendants did not rely in good faith on the 1965 guidelines because they made no "actual decision" to rely on them (Brief, p. 45) and because they did not act "as a reasonably prudent person" (Brief, p. 48).
 
 
 51
 4a.
 
 
 52
 The 1965 guidelines as published at 30 Fed.Reg. 14926 furnished no support for the argument of appellants that the guidelines do not authorize compliance with the Illinois Act, much less that they prohibit such compliance.
 
 The guidelines contain this statement:
 
 53
 Probably the most difficult area considered in these guidelines is the relation of Title VII to state legislation designed originally to protect women workers. The Commission cannot assume that Congress intended to strike down such legislation.
 
 
 54
 Thereafter, the guidelines discuss the "bona fide occupational exception as to sex" and give a number of examples to which the exception would not apply (Sec. 1604.1(a)(1)). None of the examples concern overtime practices such as those at Ottawa here involved. The guidelines then refer to laws intended to protect women, which seem clearly to include laws against overtime. The guidelines state (Sec. 1604.2(c)):
 
 
 55
 (c) The Commission does not believe that Congress intended to disturb such laws and regulations which are intended to, and have the effect of, protecting women against exploitation and hazard. Accordingly, the Commission will consider limitations or prohibitions imposed by such state laws or regulations as a basis for application of the bona fide occupational qualification exception.
 
 
 56
 In this connection, it appears (LOF Brief, p. 50) that the brief amicus curiae submitted for the United States in Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) contained this statement: "Under EEOC interpretive guidelines in effect from 1965 through August 1969, such State protective laws [as those in Illinois] were considered consistent with Title VII."
 
 
 57
 We believe that appellants are mistaken when they argue (e.g., Brief, p. 42) that the 1965 guidelines "specifically prohibit sex-segregated job categories, seniority lists and lay-off systems. 29 C.F.R. Sec. 1604.2". So they do, but with an important exception directly following in the cited section: "unless sex is a bona fide occupational qualification for that job". In the preceding section, as already quoted, the guidelines state, with reference to laws protecting women: "Accordingly, the Commission will consider limitations or prohibitions imposed by such state laws or regulations as a basis for application of the bona fide occupational qualification exception" (Sec. 1604.1(c)).
 
 
 58
 The language of the "occupational qualification" exception in Title VII itself is compelling. That language is that "it shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business ..." (Title VII, Sec. 703(e)).
 
 
 59
 To comply with the Illinois law against overtime for women, LOF had for many years employed men in those departments where overtime was regularly required and had employed women only in those departments where overtime was less frequent and where, from the nature of the work, calling in part time women employees would avoid overtime for any woman employee. This seems to meet the definition of "a bona fide occupational qualification reasonably necessary to the normal operation" of LOF's business and, as such, would not be a violation of Title VII.
 
 
 60
 The meaning of the 1965 guidelines, according to the District Court, was that "federal law would not be violated by compliance with the state law" (op. 16) and that "if an employer's employment program for women is mandated by or in furtherance of compliance with the female employment practices law of the state, such practices may be continued [after the effective date of Title VII]".
 
 
 61
 This Court has already determined the meaning of the 1965 EEOC guidelines. This Court stated that "the Equal Employment Opportunity Commission ("E.E.O.C.") had ruled that good faith reliance on state female protective laws, such as the Illinois Female Employment Act, constituted a legitimate exception to Title VII ..." Williams v. General Foods Corp., 492 F.2d 399, 402 (7th Cir.1974).
 
 
 62
 The conclusion of the District Court as to the meaning of the 1965 guidelines of EEOC is fair, reasonable, and in accord with precedent in this Court.
 
 
 63
 4b.
 
 
 64
 The District Court found that defendants "in fact relied on the published [1965] guidelines of E.E.O.C." and that "their reliance was in good faith" (op. 22). In a section titled "Reliance in Fact", the District Court referred over six or seven pages (op. 22-29) to some of the evidence on which it relied. This included testimony of LOF officers Ferguson and Kramer, exhibits, testimony of the Ottawa plant manager, testimony of Yarman (a union official), and correspondence between Yarman and the head of Local 19. The District Court described the evidence of reliance on the 1965 EEOC guidelines as "overwhelming" (op. 28). We agree.
 
 
 65
 As an example of the importance attached to the guidelines by LOF, a memorandum is in evidence from the LOF Executive Offices, to all plant managers, dated June 25, 1965--before any guidelines had been issued. This memorandum (LOF Appendix, pp. 37-38) contains the following statement:
 
 
 66
 Naturally, we intend to comply with the law [Title VII], but until some guidelines are established as to the meaning of non-discrimination because of sex, we will have to feel our way carefully.
 
 
 67
 When EEOC changed its position and its guidelines in August 1969, LOF immediately set about to change its Ottawa employment practices, and after March 5, 1970 men and women were employed under the same conditions, whatever the Illinois laws provided. This is evidence of a reliance on EEOC guidelines; appellants themselves concede that it is "some evidence of reliance" (Brief, p. 47).
 
 
 68
 Appellants argue (Brief, pp. 45-47) that reliance was not proved because the District Court did not require evidence of "an actual decision to rely" (Brief, p. 45). While no formal or written decision declaring reliance is in the record, the finding of fact that there was such a decision may be made from all the evidence which is of record after a long trial. The two district court opinions cited by appellants to support their argument, Kreitner v. Bendix Corp., 501 F.Supp. 415 (W.D.Mich.1980) and Stryker v. Register Publishing Co., 423 F.Supp. 476 (D.Conn.1976), do not seem in point. They were rendered on motions for summary judgment, not after trial, and the opinions use the expression "actual reliance" and not "actual decision". "Actual reliance" seems the equivalent of "Reliance in Fact", the expression used in this instance by the Court below.
 
 
 69
 Appellants further argue (Brief, pp. 48, 49) that defendants cannot rely on Sec. 713(b) of Title VII because they did not act as "a reasonable or prudent person". The argument depends on an acceptance of the earlier contentions that LOF was violating Title VII from its effective date in 1965. These contentions have not been accepted. The one decision cited by appellants (Brief, p. 48) for the "reasonable or prudent person" doctrine is Beebe v. United States, 640 F.2d 1283, 1293-94 (Ct.Cl.1981). That decision is not under Title VII and deals with a failure to conform to an administrative interpretation or regulation because of misunderstanding it; the decision thus deals more with conformity than with good faith. In any event, the record does not justify any finding that defendants failed to act as reasonable or prudent persons.
 
 
 70
 Looking at the record as a whole and without regard to whether the "clearly erroneous" test be applied or not, there is no basis for setting aside the finding of the District Court that defendants relied in good faith on the 1965 EEOC guidelines.
 
 5.
 
 71
 From the District Court's opinion it is reasonable to conclude, as apparently did the parties, that, without regard to reliance on the EEOC guidelines, reliance on the Illinois Female Employment Act is a good reason for denial of back pay in this instance.
 
 
 72
 There is abundant authority for this view, including Williams v. General Foods Corp., already cited, in this Court. Among many other decisions are Kober v. Westinghouse Electric Corp., 480 F.2d 240, 246-48 (3d Cir.1973); Manning v. International Union, 466 F.2d 812, 816 (6th Cir.1972), cert. denied, 410 U.S. 946, 93 S.Ct. 1366, 35 L.Ed.2d 613 (1973); Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002, 1007 (9th Cir.1972); and LeBlanc v. Southern Bell Telephone & Telegraph Co., 333 F.Supp. 602, 611 (E.D.La.1971), aff'd, 460 F.2d 1228 (5th Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed.2d 257 (1972).
 
 
 73
 Williams v. General Foods Corp., cited above, is a near precedent in this Court for the case at bar. That decision was that, in reliance on the Illinois law, the employer had violated Title VII as to employment of women where overtime was required. The issue was back pay. The District Court had granted summary judgment to the employer. The decision was reversed. This Court recognized that back pay should ordinarily be awarded where violations are proved, but that "special circumstances", including reliance on state laws, would justify the denial of back pay, adding, moreover, that in Williams "it would not be an abuse of discretion for the lower court on remand to deny any award of back pay" (492 F.2d at 408). This Court stated (492 F.2d at 408) that "state statutes are entitled to the presumption of constitutionality until their invalidity is judicially declared". This Court also found that reliance on the Illinois statutes was "reasonable until the judicial determination of September 9, 1970 ..." (492 F.2d at 408). The "judicial determination" was Caterpillar Tractor Co. v. Grabiec, 317 F.Supp. 1304 (S.D.Ill.1970). In remanding the case to determine an award of back pay or not, this Court approved a method of deciding whether back pay was appropriate by balancing the merits of the claim and its support in public policy against hardship on an employer acting in good faith. This, it seems to us, is precisely what the District Court did here.
 
 
 74
 Appellants recognize (Brief, p. 24) that the denial of back pay here was consistent with the authorities cited. The argument (Brief, p. 24 and following) is that Albemarle Paper Co. v. Moody, above cited, "squarely rejected" principles applied in many of those decisions. We do not believe this argument is accurate, among other reasons, because the Supreme Court in Albemarle expressly declined "to decide whether these decisions were correct" (422 U.S. at 423 fn. 18, 95 S.Ct. at 2374 fn. 18).
 
 
 75
 This Court has had occasion, however, to examine the effect of the Supreme Court's Albemarle decision. In Stewart v. General Motors Corp., 542 F.2d 445 (1976), cert. denied, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977), this Court discussed Albemarle and concluded that, in the absence of "special factors", back pay was to be awarded for a violation of Title VII. "Special factors", it was said, "usually include only circumstances where state legislation is in conflict with Title VII" (542 F.2d at 451).
 
 
 76
 We believe that the District Court correctly exercised its discretion by denying back pay where defendants relied on the conflicting Illinois Female Employment Act before that Act had been judicially declared unconstitutional.
 
 6.
 
 77
 The District Court found against liability of defendants on the claims made by EEOC because of equitable estoppel (op. 30, 31) and found that the plaintiffs were "equitably estopped from asking damages, in the form of claimed back wages or any other form" (op. 30).
 
 
 78
 Appellants address this matter in a footnote (Brief, p. 45 fn. 32) and in their Reply Brief (pp. 28-35). It is contended that there were no "material misrepresentations" by EEOC, that EEOC did not approve any "employment practices" of defendants, and that defendants relied on their own "unreasonable interpretation" of the 1965 guidelines. The position and published statements of EEOC have already been discussed, and this discussion need not be repeated. Nor is it necessary to consider whether the doctrine of equitable estoppel is applicable or not. Admittedly the award or denial of back pay is governed by equitable considerations, subject only to the restriction imposed by Albemarle that the reasons for a denial must be such that "if applied generally, would not frustrate the central statutory purposes" of Title VII (422 U.S. at 421, 95 S.Ct. at 2373). The District Court indicated the reasons for denial of back pay, one of the principal reasons being that no plaintiff or other member of the class had ever asked to work more overtime, had ever asked to be placed on a different seniority list, or had ever asked to be transferred to another department. This not only affects the equities of the situation, but it also means that plaintiffs have not met their burden of proof to show that each was "a potential victim of unlawful discrimination" (Teamsters v. United States, 431 U.S. 324, 327, 97 S.Ct. 1843, 1850, 52 L.Ed.2d 396 (1977)) in that they would have accepted the overtime assignments, or would have transferred to another department, or would have otherwise acted to increase their economic benefits. No such showing was made, on any proper view of this record.
 
 7.
 
 79
 There remain the cross-appeals of the two defendants. These ask for reversal of the order, filed June 27, 1975, permitting EEOC to intervene as a plaintiff-intervenor.
 
 
 80
 After EEOC has taken an active and leading part in this litigation for well over eight years, in the trial court and on these appeals, it would serve no useful purpose at this late stage to require dismissal of EEOC as a party. Presumably EEOC could still be heard amicus curiae and as such could be permitted to make and submit oral and written arguments. It would be cumbersome to follow such a procedure. Moreover, this long-lasting action seems now in its final chapter.
 
 
 81
 The argument for defendants is that the charge was not "pending" before EEOC on March 24, 1972, the effective date of the 1972 amendments to Title VII giving authority to EEOC to intervene in actions such as that at bar. This argument is entirely an afterthought, made much too late to hold the District Court in error for rejecting it.
 
 
 82
 EEOC's motion to intervene filed May 10, 1975, was opposed by defendants but not on the ground now pressed here. The motion was granted by order filed June 27, 1975.
 
 
 83
 Over three years later, LOF, on October 10, 1978, filed a motion to dismiss EEOC as plaintiff-intervenor but not on the ground now pressed here. The motion was denied.
 
 
 84
 Over four years later, on July 3, 1979, LOF filed a motion to reconsider its motion to dismiss EEOC as a party and for the first time raised the point that the charge was not "pending" before EEOC on March 24, 1972.
 
 
 85
 The record shows that, in opposition to LOF's motion, EEOC established, among other things, that the case was not administratively closed by EEOC until April 11, 1973 (Exhibit A to EEOC Memorandum in Opposition to Motion of LOF to Reconsider LOF's Motion to Dismiss Plaintiff-Intervenor). The motion was denied by order filed October 22, 1979.
 
 
 86
 Under all the circumstances, the District Court was justified, as are we, in treating the charge of plaintiff Le Beau as "pending" at EEOC on March 24, 1972.
 
 
 87
 On the appeals of plaintiffs and a class representative and on the appeal of EEOC, the judgment of the District Court is affirmed.
 
 
 88
 On the cross-appeals of defendant LOF and defendant Local 19, the order of the District Court, filed June 27, 1975, granting a motion by EEOC for leave to intervene as a plaintiff, is affirmed.
 
 
 
 *
 The Honorable Inzer B. Wyatt, Senior District Judge of the Southern District of New York, is sitting by designation