(No. 80075

RAINTREE HEALTH CARE CENTER, Appellant, v. THE ILLINOIS HUMAN RIGHTS COMMISSION *et al.*, Appellees.

*Opinion filed October 18, 1996.*

BILANDIC, C.J., joined by MILLER, HEIPLE and McMOR-
ROW, JJ., specially concurring.

Judith S. Sherwin and Mark J. Bereyso, of Leven-
feld, Eisenberg, Janger & Glassberg, of Chicago, for ap-
pellant.

James E. Ryan, Attorney General, of Springfield

(Barbara A. Preiner, Solicitor General, and Jacqueline M. Zydeck, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Human Rights Comm'n.

Robert H. Dachis, of Keefe & Dachis, of Chicago, for appellee James W. Davis.

JUSTICE HARRISON delivered the judgment of the court:

James Davis, the original complainant in this case, filed a discrimination charge with the Illinois Department of Human Rights alleging that his employer, Raintree Health Care Center (Raintree), violated the Illinois Human Rights Act (Ill. Rev. Stat. 1987, ch. 68, par. 1—101 *et seq.*) by discharging him after learning that he tested positive for the human immunodeficiency virus (HIV). After a three-day hearing, an administrative law judge (ALJ) concluded that Raintree had discriminated against Davis by constructively discharging him on the basis of a physical handicap, his infection with HIV. The ALJ recommended Davis' reinstatement to his former position, or a substantially equivalent position with pay and benefits, and awarded him back pay, plus interest, and reasonable attorney fees. The Illinois Human Rights Commission upheld the ALJ's recommended order and decision. Ill. Hum. Rts. Comm'n Rep. 1988CN2190 (April 15, 1994). The appellate court, with one justice dissenting, affirmed the final order of the Illinois Human Rights Commission. 275 Ill. App. 3d 387. We allowed Raintree's petition for leave to appeal. 155 Ill. 2d R. 315.

The central issue raised in this appeal is whether the Illinois Human Rights Commission properly determined that Raintree's constructive discharge of Davis, based on his HIV-positive status, amounted to a violation of the Illinois Human Rights Act. To resolve this issue we must also determine whether public health

statutes and regulations in effect at the time of this action prohibited Davis from working at the Raintree nursing home and whether Raintree's belief that these regulations did in fact bar Davis from working at its facility is relevant in determining liability under the Illinois Human Rights Act. The final issue raised by Raintree is whether it was entitled to discovery and a hearing on Davis' petition for attorney fees. For the reasons which follow, we affirm the judgment of the appellate court.

The testimony presented at the evidentiary hearing before the ALJ established the following facts. Raintree operates a nursing home facility in Evanston, Illinois. Raintree hired James Davis as a kitchen helper in March of 1987. Raintree later promoted Davis to the position of cook at the facility. In June of 1987, Davis was fired for fighting on the job, but Raintree rehired Davis in November of 1987, when his supervisor asked him to return. Both parties stipulated that after Davis was rehired, he performed his duties as a cook in an acceptable manner consistent with Raintree's standards. Davis' responsibilities as a cook consisted of preparing the evening meal, placing the food on trays, and cleaning and straightening the kitchen and storeroom areas. In performing these duties, Raintree required Davis to wear gloves. Davis had no direct contact with the residents of the facility.

On January 12, 1988, Davis' doctor informed him that he had tested positive for HIV. After reporting to work that same day, Davis told his supervisor, Pearl Smith, that he had just been diagnosed as being HIV-positive. Smith suggested that Davis begin working while she went to discuss the matter with Burton Behr, the administrator of the facility. Behr then called Davis into his office for a meeting. At this first meeting, Behr told Davis that Raintree needed information from pub-

lic health officials to determine whether Davis could continue his employment. Behr then allowed Davis to return to work. Behr testified that after this first meeting, he began looking through the Illinois Department of Public Health regulations and the City of Evanston regulations governing the licensing of nursing homes. Behr found nothing in the nursing home regulations that addressed the situation of an HIV-positive employee.

Behr testified that on this day, he made several telephone calls to the Evanston board of health, the Illinois Department of Public Health, and the Illinois Council on Long Term Care for advice on how to handle Davis' situation. Behr was unable to receive a definitive answer as to whether Davis' condition made him ineligible to work in a nursing home. Behr testified that when he spoke with Louise Brown, the director of the Evanston board of health, he explained to her that he "could not find anything in the rules and regulations anywhere that specifies HIV-positive," and asked whether Davis could continue working at the facility. Behr testified that Brown responded, "I can't tell you he can't work there, but I can tell you if something should occur because he is working there, then you are subject to the rules and regulations." Behr replied that "there are no rules and regulations governing this." Brown again responded, "You will have to go with the rules and regulations that stand until it can be clarified, so according to the rules and regulations, he is unable to work there at the present time ***." Behr also spoke with Rose Ferrell, a regional supervisor of the Illinois Department of Public Health. Behr testified that Ferrell simply told him to follow the rules and regulations and that she would check further and get back to him. Similarly, Terry Sullivan, the director of the Illinois Council on Long Term Care, offered no recommendation on how Behr should proceed.

After conducting this inquiry, Behr called Davis back to his office. Behr told Davis that he thought it was best that Davis go home until he found out more information as to whether the nursing home regulations prohibited HIV-positive persons from working at Raintree. Behr advised Davis that when he found out more information he would telephone him. Behr also requested that Davis bring a note from his doctor stating that "he was free of a communicable disease or that he was allowed to work with the HIV virus." That same week, Davis obtained a doctor's note as Behr requested. The note, signed by Davis' doctor, stated:

"To Whom It May Concern:

Mr. James Davis HIV status does not restrict him from performing his current job as a cook in a nursing home. The HIV (AIDS Virus) is NOT transmitted through the preparation or serving of food and beverages. Transmission is through blood and body fluids. Should Mr. Davis cut himself in the course of the food preparation, that food should be discarded the same as if any employee had bled into food. Should you have any further questions, please contact the nurse with the clinic, Kathy Pietschmann, R.N., M.S. at 943-6600 ext. 401.

Sincerely,

(Signed) TOM SKOUTELIS

Tom Skoutelis, M.D."

Despite the note, Behr did not allow Davis to return to work at Raintree. Behr testified that the Evanston board of health informed him that the note was insufficient to permit Davis to return to work because it did not specify that Davis was free from a contagious or infectious disease. Behr further stated that he contacted the nurse referred to in the doctor's note and she just reiterated the information contained in the note. Behr continued to communicate with the Illinois Department of Public Health and the Evanston board of health to try to get an opinion as to whether Davis' condition made him ineligible to work in a nursing home. As

stated, Behr never received a conclusive answer from either of these agencies.

For several weeks after he was initially requested to go home, Davis contacted the Raintree facility on numerous occasions to find out if Behr had received an answer from the board of health and if he could return to work. Each time he called, Davis was told that Raintree had not yet received an answer from public health officials. From the time that he left the facility on January 12, 1988, Davis was never contacted by either Behr or Smith and was never allowed to return to work. Throughout this time when Behr was seeking an official opinion as to the impact of Davis' condition on his employment, Davis received no salary from Raintree.

In early February 1988, Davis' brother, who also worked as a cook at Raintree, informed Davis that he had been fired. Davis testified that he believed what his brother told him because he had not heard from anyone at Raintree for over three weeks. Davis did not call Raintree or seek confirmation that he had been fired. In early February, Davis filed for unemployment compensation benefits. Raintree contested the unemployment claim contending that it had never terminated Davis' employment. Davis was ultimately denied unemployment benefits.

On February 3, 1988, Davis filed a discrimination charge with the Illinois Department of Human Rights. After an investigation of the charge, on January 5, 1989, the Department of Human Rights filed a complaint on behalf of Davis, alleging that Raintree discriminated against Davis on the basis of a physical handicap. In February of 1989, Raintree offered Davis another position, at the same $4.20 rate of pay per hour, at a different nursing home facility located in Highland Park, Illinois. At the time of the offer, Davis lived at 43rd and Michigan Avenue in downtown Chicago. Davis did not

own a car and relied on public transportation. The job at Highland Park was over 40 miles from Davis' home and would require approximately a $2^1/2$-hour commute each way on public transportation. Davis refused the job due to the long commute.

The parties appeared for a three-day hearing before an ALJ beginning on February 24, 1992. Upon consideration of the evidence presented, the ALJ issued a recommended liability determination on October 9, 1992. The ALJ found that Raintree discriminated against Davis by constructively discharging him based on his HIV-positive status, a protected physical handicap. On October 28, 1992, Davis filed a petition for attorney fees and costs in the amount of $42,909.98, supported by affidavits of his counsel and a billing worksheet. Davis also requested a multiplier in the amount of 50%. Raintree filed a motion for discovery and depositions regarding the reasonableness of the attorney fees. After a hearing on Raintree's motion, the ALJ denied the request for discovery. Raintree eventually responded to Davis' petition for fees and moved for an evidentiary hearing and oral argument on these issues. The ALJ denied Raintree's motion, noting that oral arguments in such a circumstance were "highly unusual" and that Raintree offered "no explanation why this case required a variation from standard procedure." On July 8, 1993, the ALJ issued a recommended order and decision regarding attorney fees in this case. The ALJ rejected Davis' request for a fee multiplier of 50%, reduced the hourly rate requested for two of the attorneys, and rejected Raintree's challenge to the number of hours billed and the costs requested. The ALJ awarded Davis $28,956.50 in attorney fees.

Raintree filed exceptions to the ALJ's recommendations as to liability and attorney fees with the Human Rights Commission. On April 15, 1994, the Commission

issued its order and decision adopting the recommended decision of the ALJ and rejecting the exceptions filed by Raintree. Ill. Hum. Rts. Comm'n Rep. 1988CN2190 (April 15, 1994). The Commission reasoned that Raintree discriminated against Davis on the basis of a physical condition which was unrelated to his ability to do the job in question, which amounted to a violation of the Illinois Human Rights Act. The Commission noted that the only medical evidence presented was the doctor's note obtained by Davis, which stated that Davis' infection with HIV did not restrict him from performing his current job. The Commission further determined that the guidelines which Raintree relied on, section 300.650(a)(4) of Title 77 of the Illinois Administrative Code (77 Ill. Adm. Code § 300.650(a)(4) (1985)), did not bar Davis from working at the facility with his condition. The Commission concluded that HIV was not included in the list of "contagious and infectious diseases" outlined in section 690.100 of Title 77 of the Illinois Administrative Code (77 Ill. Adm. Code § 690.100 (Supp. 1987)) which would have limited Davis' ability to work in a nursing home. The Commission further held that Raintree's good-faith belief that the public health regulations prohibited it from employing Davis was not relevant in determining whether it had violated the Human Rights Act. Davis died on November 27, 1994, and his estate was substituted as the complainant in this action in March 1995.

On August 25, 1995, the appellate court issued its opinion confirming the Commission's decision. 275 Ill. App. 3d 387. The court agreed that firing Davis based solely on his infection with HIV, a protected physical condition, violated the Human Rights Act. The court reasoned that before rejecting Davis for employment, Raintree should have made an individualized determination as to Davis' ability to perform the work of a cook.

The court further rejected Raintree's argument that its decision to terminate Davis was compelled by nursing home regulations. The dissenting justice believed the Commission's decision to be against the manifest weight of the evidence. He would have held that Raintree's good-faith belief that it was required to terminate Davis' employment based on public health regulations exempted it from liability for handicap discrimination. Raintree now appeals, arguing that the dissenting justice properly determined that the Commission's decision was against the manifest weight of the evidence.

When reviewing a decision by an administrative agency, "the findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3—110 (West 1994). In addition, the Commission's findings of fact should be sustained unless the court determines that such findings are against the manifest weight of the evidence. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 180 (1989). However, a reviewing court is not bound to give the same deference to an administrative agency's conclusions of law and statutory construction, and exercises independent review over such questions. See *Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 1046 (1989).

On this appeal, we will first address whether Raintree's decision to discharge Davis, because he tested positive for HIV, constituted employment discrimination under the Human Rights Act. We will later address whether the existing health regulations compelled Raintree's discriminatory actions and whether Raintree's belief that Davis' discharge was required should relieve the nursing home from liability.

The Illinois Human Rights Act (the Act) specifically prohibits discrimination in employment against the physically and mentally handicapped. Ill. Rev. Stat.

1987, ch. 68, par. 1—102(A). The term "unlawful discrimination" is defined by the Act as "discrimination against a person because of his *** handicap." Ill. Rev. Stat. 1987, ch. 68, par. 1—103(Q). The Human Rights Act further defines "handicap," for purposes of employment discrimination, as: "a determinable physical or mental characteristic of a person, *** the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic *** is unrelated to the person's ability to perform the duties of a particular job or position." Ill. Rev. Stat. 1987, ch. 68, par. 1—103(I)(1). Finally, the Act provides that it is a civil rights violation "[f]or any employer to *** discharge *** on the basis of unlawful discrimination." Ill. Rev. Stat. 1987, ch. 68, par. 2—102(A). Therefore, under the Act, it would be unlawful for an employer to fire an employee because of his physical handicap, if that handicap was unrelated to his ability to perform his job duties. Such a firing would be deemed "unlawful discrimination" based on a physical handicap under the terms of the Human Rights Act.

Respondents, the estate of Davis and the Illinois Human Rights Commission, assert that it is undisputed that Davis' HIV infection is a protected condition under the Act. We agree that infection with HIV is a determinable physical characteristic resulting from a disease which has been held to be a qualifying condition under civil rights laws. See *Doe v. Kohn, Nast & Graf, P.C.*, 862 F. Supp. 1310, 1321 (E.D. Pa. 1994); *Doe v. District of Columbia*, 796 F. Supp. 559, 568 (D.D.C. 1992). The issue then becomes whether Davis' handicap was unrelated to his ability to perform his job duties, rendering his termination unlawful.

Traditionally, when analyzing employment discrimi-

nation claims under the Human Rights Act, Illinois courts and the Commission generally apply a three-part analysis. *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79 (1989). First, under this analysis, "plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination." *Zaderaka*, 131 Ill. 2d at 178-79. Second, to rebut the presumption that an employer unlawfully discriminated against an employee, the employer must articulate a legitimate, nondiscriminatory reason for its decision, such as an employee's poorly performing his job, committing some act of misconduct, or missing excessive days of work. Finally, if an employer articulates a legitimate, nondiscriminatory reason, then plaintiff must prove by a preponderance of the evidence "that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination." *Zaderaka*, 131 Ill. 2d at 179.

Although this is the conventional formulation, this three-part analysis is not useful in the case before us because, here, there is no dispute as to why Raintree discharged Davis. The facts establish that the sole reason Raintree terminated Davis was because he tested positive for HIV. Where, as here, the reasons for an adverse job action are uncontroverted, the dispositive issue is simply whether the handicapped person could perform the particular work involved. See *Board of Trustees of the University of Illinois v. Human Rights Comm'n*, 138 Ill. App. 3d 71, 75 (1985).

As stated, the Illinois Human Rights Act provides that adverse employment actions cannot be taken against any person due to his or her physical handicap if the handicap is unrelated to the person's ability to perform job duties. Ill. Rev. Stat. 1987, ch. 68, par. 1—103(I)(1). Courts have applied this principle to require employers to make individualized determinations of

whether a particular handicapped employee or applicant is able to perform the work required by a particular job. See *Board of Trustees*, 138 Ill. App. 3d at 75; *Melvin v. City of West Frankfort*, 93 Ill. App. 3d 425, 429 (1981). An individualized determination of a handicapped person's abilities is required because "it is the express policy of this State that eligibility for employment be based upon individual capacity." See *Melvin*, 93 Ill. App. 3d at 429.

In *Melvin*, the court examined whether a section of the Illinois Municipal Code which barred amputees from employment eligibility with the fire and police departments, except for clerical duties, was unconstitutional. The court reasoned that the Illinois Constitution, article I, section 19 (Ill. Const. 1970, art. I, § 19), prohibits "distinctions in hiring handicapped individuals which are not related to the ability of a particular applicant to satisfactorily perform particular work." See *Melvin*, 93 Ill. App. 3d at 429. The court noted that these guarantees set forth by article I, section 19, have since been implemented by the Illinois Human Rights Act which prohibits discrimination in employment based on a physical handicap. See *Melvin*, 93 Ill. App. 3d at 430. The court concluded that this section of the Municipal Code was unconstitutional because the regulation imposed a blanket restriction against all amputees and failed to allow for an individualized determination of whether a particular person could perform a particular job. See *Melvin*, 93 Ill. App. 3d at 429-31.

In *Board of Trustees*, the court applied the standard enunciated in *Melvin* to hold that the University of Illinois discriminated against an amputee because it did not make a more thorough inquiry into plaintiff's ability to overcome his handicap and perform the duties required. See *Board of Trustees*, 138 Ill. App. 3d at 76. In *Board of Trustees*, an amputee who had been a sheet metal worker for over 17 years applied for a sheet metal

position with the university. The university would not hire him due to his amputation. The court held that the university unfairly discriminated against the plaintiff by deciding not to hire him without first testing his agility or ability to climb, and without any evidence that his handicap impaired his past work performance as a sheet metal worker. See *Board of Trustees*, 138 Ill. App. 3d at 75. The court further noted that the reason for rejecting plaintiff seemed to be "a good faith but overly cautious decision after an insufficiently thorough investigation" of whether this particular handicapped person could perform the particular work involved. See *Board of Trustees*, 138 Ill. App. 3d at 76.

In this case, both the appellate court and the Commission found that Raintree did not prove that it had made an individualized determination of Davis' ability to perform his job duties without undue harm to himself or others. 275 Ill. App. 3d at 395. The appellate court and the Commission also noted that the only medical evidence submitted, the doctor's note, stated that Davis' handicap would not prevent him from performing his job as a cook. We agree with the appellate court's holding.

In the case at bar, Raintree discharged Davis without making a determination on its own whether employing Davis as a cook would pose a risk to its residents. The doctor's note was the only medical evidence presented, and it established that Davis' infection with HIV was unrelated to his ability to perform his duties as a cook at Raintree. The note specifically stated that Davis' HIV status did not restrict him from performing his job as a cook and that HIV was not transmitted through food preparation. Raintree presented absolutely no contrary medical evidence. Nothing in the record indicates that Raintree made any inquiry as to how HIV is transmitted or whether there

was any risk of an HIV-infected cook passing on the disease to nursing home residents. There is no evidence that Raintree spoke to any other doctors, such as the ones working at its nursing home facility, or consulted any medical literature as to the characteristics and risks of transmission of HIV. Raintree was only concerned with receiving a definitive answer from the Department of Public Health or the Evanston board of health as to whether it would violate any rules or regulations to continue to employ Davis. Raintree's actions do not constitute an individualized inquiry as to whether James Davis could safely perform his duties as a cook with the HIV virus. But rather, just like the University of Illinois in the *Board of Trustees* decision, here, Raintree seems to have made an overly cautious decision after an insufficiently thorough investigation which resulted in unfair treatment for Davis. Illinois courts have not tolerated blanket restrictions against the employment of amputees in *Melvin* and *Board of Trustees* and we will not allow such an unqualified bar against the employment of an individual inflicted with HIV. We conclude that Raintree's constructive discharge of Davis amounted to unlawful discrimination in violation of the Illinois Human Rights Act.

Raintree argues that the public health regulations outlining nursing home policies in existence at the time of this action prohibited Davis from working in its nursing home. Specifically, Raintree refers to section 300.650(a)(4) of Title 77 of the Illinois Administrative Code, which outlined personnel policies for nursing homes and provided:

> "An employee diagnosed or suspected of having a contagious or infectious disease shall not be on duty until such time as a written statement is obtained from a physician that the disease is no longer contagious or is found to be noninfectious." 77 Ill. Adm. Code § 300.650(a)(4) (1985).

Raintree contends that Davis' infection with HIV con-

stituted a diagnosis of a contagious and infectious disease and that section 300.650(a)(4) prevented such an employee from working in a nursing home. According to Raintree, section 300.650(a)(4), on its face, encompassed HIV as a contagious and infectious disease and no extrinsic sources needed to be consulted. Furthermore, Raintree notes that since the Public Health Code compelled it to terminate Davis because of his HIV status, it cannot be held liable under the Human Rights Act. It is Raintree's position that section 300.650(a)(4) conflicted with the Human Rights Act and required it to commit a discriminatory employment action against Davis to comply with the health regulations governing nursing homes. Raintree argues that complying with health regulations is a legitimate reason for terminating Davis' employment.

In this case, both the Commission and the appellate court held that section 300.650(a)(4) did not serve to bar Davis from working at Raintree because HIV was not considered a contagious and infectious disease. 275 Ill. App. 3d at 394. The appellate court and the Commission noted that the section in question, 300.650(a)(4), did not define the terms contagious and infectious disease. Both the Commission and the appellate court turned to section 690.100 for such a definition. 77 Ill. Adm. Code § 690.100 (Supp. 1987). Section 690 was cross-referenced in section 300.650(a)(3)(A), which was the same subject regulation as 300.650(a)(4). In general, section 300.650 outlined personnel policies for nursing homes and made reference to section 690, which addresses the reporting and control of communicable diseases.

Section 690.100 lists reportable diseases and conditions and specifically states: "The following are declared to be contagious, infectious, communicable and dangerous to the public health and each suspected or diagnosed case shall be reported to the Illinois Department of Pub-

lic Health." 77 Ill. Adm. Code § 690.100 (Supp. 1987). The section goes on to list a number of contagious, infectious, communicable and dangerous conditions and diseases. AIDS is among the diseases listed, but the status of being HIV positive is not on the list. There are no other regulations declaring which diseases are considered contagious and infectious to the public or which diseases must be reported to protect the safety of others. We cannot interpret section 300.650(a)(4) as referring to all possible contagious and infectious diseases, when another section, which was cross-referenced in the subject regulation, specifically lists which diseases the Illinois Department of Public Health considers to be contagious, infectious, communicable, and dangerous. We hold that the terms "contagious" and "infectious" are terms of art defined within section 690.100 of the public health regulations, and if the disease was not included in the list, it is not considered to be "contagious" or "infectious." It is undisputed that when Davis was terminated in January 1988, he did not suffer from AIDS, and was just diagnosed as having HIV. Since HIV was not listed within section 690.100, it was not considered a contagious and infectious disease for purposes of applying section 300.650(a)(4). Therefore, section 300.650(a)(4) did not serve to bar Davis from continuing his employment with Raintree or require him to obtain a doctor's clearance.

Raintree argues that the distinction drawn between HIV and AIDS by the appellate court and the Commission in this case was inappropriate and irrational. However, other sections in these public health regulations support this distinction. At the time of this action, section 690.290, part of the chapter on the control and reporting of communicable disease, defined a suspected case of AIDS as having two or more of the following signs or symptoms: "unexpected weight loss of greater

than 10% body weight, chronic fever, chronic lymphad-enopathy, night sweats and chronic diarrhea." 77 Ill. Adm. Code § 690.290(a) (Supp. 1987). This definition did not encompass the status of being HIV positive and showing no visible signs of AIDS. In addition, the regulation goes on to state, at section 690.290(d), that "Persons who are prohibited from donating blood *** because of evidence of infection with HTLV-III virus, increased risk of infection with HTLV-III virus, AIDS or suspected AIDS may make donations for the limited purpose of autologous transfusion, instillation, transplantation or injection." 77 Ill. Adm. Code § 690.290(d) (Supp. 1987). Furthermore, section 690.290(c)(3) provides that all blood and serum from blood donors should be tested for HTLV-III. 77 Ill. Adm. Code § 690.290(c)(3) (Supp. 1987). The term HTLV-III was an early name for HIV, and was referred to as a separate condition, distinct from AIDS, in sections 690.290(c) and (d). Accordingly, from the references in sections 690.290(a), (c), and (d), it is clear that the Department of Public Health recognized the difference between HIV-positive status and AIDS in 1988. Therefore, the Department's reference to AIDS as an infectious and contagious disease cannot be inter-preted as automatically including the condition of HIV. When the Department meant HIV in other regulations, it referred to it separately or as its early name HTLV-III. We hold that on its face, the regulation in question did not prevent employees infected with HIV from work-ing in nursing homes.

Moreover, Raintree cites the language of section 300.650(a)(4) of Title 77 of the Illinois Administrative Code as completely justifying its decision to terminate Davis, reasoning that the section required Raintree to prevent an HIV-positive cook from working at its facil-ity. However, the language from section 300.650(a)(4) was not a blanket restriction compelling all employees

with HIV to be terminated and never allowed to return to their nursing home jobs. Rather, section 300.650(a)(4) allowed employees diagnosed as having contagious or infectious diseases to return to work after obtaining a doctor's note stating the disease was no longer contagious or found to be noninfectious.

Although Davis himself was not subject to the note requirement, he obtained such a note and presented it to Burton Behr. The note, signed by Davis' physician, explained that Davis' HIV status did not prevent him from performing his job as a cook and that HIV was not transmitted through food preparation or service. Behr stated that he was informed by the Evanston board of health that the note was inadequate because it did not state that Davis was free of contagious or infectious disease. However, Behr did not specify that the note had to contain this exact language. Behr admitted at the hearing before the ALJ that he asked Davis to get documentation stating "that he was free of a communicable disease or that he was allowed to work with the HIV virus." Davis complied, producing a note which stated that his infection with HIV did not restrict him from performing his job as a cook. Yet Raintree refused to return Davis to work, and never contacted Davis to give him further information explaining what he could do to return to work.

We hold that Davis was not required to present a note since section 300.650(a)(4) did not apply in this case. However, even if this section applied to Davis, the doctor's note which he provided may have complied with the provisions of section 300.650(a)(4), and certainly complied with the instructions he was given from Burton Behr. At this point, Raintree should have conducted its own investigation concerning whether it was safe to return Davis to work, and contacted Davis to give him a chance to comply with any further requirements in order to get his job back.

Raintree next argues that even if it improperly interpreted the regulation in question, its good-faith belief that Davis' continued employment was in violation of section 300.650(a)(4) relieved it from liability under the Illinois Human Rights Act. Raintree contends that it was entitled to rely on the Evanston health department director's interpretation of the subject regulation. According to Raintree, Louise Brown, the director of the Evanston health department, informed him that Davis could not work at Raintree at the present time, and that his doctor's note was inadequate. Raintree states that when it sent Davis home it was only making a good-faith attempt to comply with state law as interpreted by the Evanston health department. The dissenting justice in the appellate court agreed that the only reason for Davis' termination was Behr's good-faith belief that keeping Davis would be a violation of section 300.650. Both Raintree and the dissenting appellate court justice assert that under the reasoning of *Le Beau v. Libbey-Owens-Ford Co.*, 727 F.2d 141 (7th Cir. 1984), a good-faith belief that one's actions are required to comply with state law is a defense to liability under the Illinois Human Rights Act.

The *Le Beau* case was a gender discrimination suit concerning a conflict between a state law prohibiting women from working overtime and Title VII of the Civil Rights Act of 1964, which forbade employers from refusing to offer overtime work to women. In *Le Beau*, plaintiffs, female employees of Libbey-Owens-Ford, brought suit claiming that defendants violated Title VII by restricting females to employment in only two departments, and by employing men in departments where overtime was required, while employing women in departments where overtime was less frequent. Beginning in 1909, Illinois had in effect the Illinois Female Employment Act (Ill. Rev. Stat. 1908, ch. 48, par. 25),

which provided that women could not work more than eight hours in any one day or more than 48 hours in any one week. Therefore, Libbey-Owens-Ford separated men and women into these two different departments, placing men in the continuous operations of glass production because these jobs frequently required overtime. In making their employment decisions, Libbey-Owens-Ford relied on 1965 guidelines promulgated by the Equal Employment Opportunity Commission (EEOC) providing that state laws protecting women against overtime work would be considered by the EEOC as *bona fide* occupational qualifications not in conflict with Title VII. In *Le Beau*, the court held that the employer did not violate Title VII because it relied in good faith on these 1965 EEOC guidelines. See *Le Beau*, 727 F.2d at 149.

We find that *Le Beau* is distinguishable from the case at bar, and its reasoning should not be applied to create a good-faith defense to liability under the Human Rights Act when the state regulation Raintree relied on did not even apply in this case. Title VII contains a defense to liability for a civil rights violation when it was pleaded and proved that the act or omission complained of was in good faith and in reliance on "any written interpretation or opinion" of the EEOC. 42 U.S.C. § 2000e—12(b) (1994). In the *Le Beau* decision, the employer, Libbey-Owens-Ford, relied on EEOC guidelines which specifically stated that actions to protect women from exploitation and hazard would not violate Title VII. Therefore, in *Le Beau,* the employer's actions fell under this good-faith defense to liability. The Human Rights Act does not contain any good-faith exemption analogous to the exemption in section 2000e—12(b) of the Civil Rights Act. Nowhere does the Human Rights Act state that a good-faith belief that one's discriminatory actions are required by state law is a defense to liability. A statute must be enforced as

enacted by the legislature. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 91 (1992). Because the Human Rights Act does not contain a good-faith exemption, we will not apply the reasoning from *Le Beau* to create one.

Moreover, in *Le Beau,* there was an actual conflict with the Illinois Female Employment Act preventing overtime employment for women and Title VII. In the case at bar, there was no conflict between the state regulation and the Illinois Human Rights Act. This is because the state regulation does not even apply in this case. We previously stated that section 300.650(a)(4) did not ban Davis from working at Raintree because his HIV-positive status was not considered a contagious or infectious disease. An employer's good-faith belief that it is required to discriminate under another law is of no legal consequence when that law does not apply. Unlike the employer in *Le Beau*, Raintree was not required to violate one act to comply with another. In *Board of Trustees,* the court held that a good-faith belief that an employment restriction is justified did not negate the impropriety of unfairly denying a handicapped plaintiff employment. We agree that the question is not whether Raintree had a good-faith belief that the rules prohibited Davis from working at a nursing home with the HIV virus, but whether in fact the rules so provided. We find that Raintree's alleged good-faith belief, that it was required to terminate Davis, is irrelevant in determining liability under the Human Rights Act.

Furthermore, we find it questionable whether the facts of this case even support a finding that Raintree was acting in good faith. Raintree contends that it believed in good faith that it was required to fire Davis to comply with the regulation, yet the ALJ and the Commission determined that Raintree never received a definitive answer from health authorities regarding

whether Davis could continue to work there. The only information close to a definite answer was from Louise Brown, the director of the Evanston board of health. Brown first stated that she could not tell Behr that Davis could not work there, but that if something should occur, Raintree would be subject to the rules and regulations. Brown went on to state that Behr should go with the rules and regulations until it could be clarified, "so according to what is in the rules and regulations, he is unable to work there at the present time." Raintree claims that it should be permitted to rely on Brown's interpretation of the subject regulation. However, section 300.650(a)(4), the regulation cited by Raintree, is an Illinois Department of Public Health Regulation. Raintree has not cited any authority indicating that it was permitted to rely on a local official's construction of state law. In addition, this information from Brown was not a definitive interpretation of the regulation. She merely told Behr that Davis should not work at Raintree until the regulations could be clarified.

Raintree claims that its actions were compelled by state regulations and Brown's directives, yet it still clings to its assertion that neither the public health regulations nor the public health authorities ever gave it guidance on how to handle Davis' situation. Behr claims that throughout the entire time Davis waited for a decision, he attempted to obtain an official opinion regarding Davis' future employment. Behr concedes that he never received a definitive answer. Behr also admitted that the regulation itself did not specifically address the situation of an HIV-positive employee when he testified that he did not "find anything in the rules and regulations anywhere that specifies HIV-positive." Raintree cannot persuasively argue that Behr's subjective belief was that the regulation unequivocally prohibited Davis from working at the facility, when throughout his

testimony Behr maintained that he never really knew what to do about Davis.

Furthermore, if Raintree had a strong belief that Davis' continued employment would be in violation of public health regulations, one would have expected Raintree to have contacted Davis and explained to him that it would have to let him go to comply with state law. However, Davis was never contacted by Raintree, and every time he called Raintree to find out his status, it informed him that it was still searching for an answer as to whether the public health regulations actually prohibited his employment. In addition, the evidence Davis presented, which proved that it was safe for him to continue to work at Raintree, was dismissed as insufficient. Without any medical inquiry or discussion, Raintree concluded that the doctor's note Davis obtained was completely inadequate, in spite of the fact that the note complied with the instructions given by Behr himself. Accordingly, even if Raintree's good faith were a defense under the Human Rights Act, it could not be invoked by Raintree here.

Raintree next makes a very brief argument that the Human Rights Act and the health regulation in question failed to give it adequate notice of what conduct was warranted or prescribed under these circumstances. According to Raintree, to hold it liable under the Human Rights Act for its efforts to comply with the law violates its due process rights and amounts to a taking of property without just compensation. We need not consider the merits of these constitutional issues because Raintree concedes that it raised this argument for the first time in its petition for rehearing before the appellate court. It is well established that "issues not raised during an administrative proceeding are waived and will not be considered for the first time on appeal." See *Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 1044 (1989).

Finally, Raintree contends that it was entitled to discovery and a hearing on Davis' petition for attorney fees and that the award of attorney fees constituted an abuse of discretion by the ALJ. According to Raintree, a party who is charged with the payment of attorney fees should be afforded an evidentiary hearing and ample opportunity to cross-examine as to the reasonableness of the amounts claimed. Raintree claims that it is entitled to such a hearing because in its response to Davis' petition for attorney fees it raised numerous issues concerning the credibility, authenticity, and reliableness of the attorney's time records and whether they were kept contemporaneously and in the normal course of litigation.

It is well established that it is within the discretion of the trier of fact to determine the reasonableness of the attorney fees requested, and a court of review should not make a *de novo* decision as to the appropriate award of attorney fees. See *Harris Trust & Savings Bank v. American National Bank & Trust Co.*, 230 Ill. App. 3d 591, 598-99 (1992). The Illinois Human Rights Act specifically states that upon a finding of a civil rights violation, an ALJ may recommend and the Commission may require that reasonable attorney fees be paid to the complainant for the cost of maintaining the action. Ill. Rev. Stat. 1987, ch. 68, par. 8—108(G). The Human Rights Commission's rules governing petitions for attorney fees and costs impose no requirements that a hearing be conducted to resolve contested issues regarding claims for fees. But rather, the rule states that the ALJ "may convene a hearing to resolve contested issues and may take other steps to produce a complete record with regard to a claim for fees and/or costs." 56 Ill. Adm. Code § 5300.765(e) (1996). The rules go on to state that after the submission of the petition for fees and objections thereto "and the completion of a hearing, if

any, the Administrative Law Judge shall prepare a Recommended Order and Decision." 56 Ill. Adm. Code § 5300.765(f) (1996). Under these authorities, it is within the ALJ's discretion to determine whether or not a hearing is necessary. As long as the ALJ is able to determine what amount would be a reasonable award of attorney fees, from evidence presented in the petition and the answer, such a determination should not be disturbed on review.

Furthermore, courts frequently award attorney fees without discovery by the party charged with paying them and without holding evidentiary hearings. In *Singer v. Brookman*, 217 Ill. App. 3d 870, 880 (1991), the appellate court affirmed the trial court's award of attorney fees and costs as sanctions, without holding a hearing. The *Singer* court found that the attorney fees awarded by the lower court without an evidentiary hearing were not unreasonable and were properly determined "after a detailed breakdown of fees and expenses by defendant's counsel." See *Singer*, 217 Ill. App. 3d at 880. In addition, in *Kellett v. Roberts*, 276 Ill. App. 3d 164, 174-75 (1995), the court held that the trial court did not err in failing to hold a hearing on the amount of sanctions or attorney fees. The court reasoned that since the trial court was able to rely on the plaintiff's attorney's legally sufficient affidavit and detailed time sheet, and defense counsel was not denied an opportunity to present evidence, "the trial court did not err in failing to hold a hearing on the amount of fees." See *Kellett*, 276 Ill. App. 3d at 175.

In this case, once a civil rights violation was established, and the ALJ and Commission decided to award attorney fees, all that remained was a determination of the amount. The ALJ carefully examined the fee petition, affidavits, the detailed billing worksheet submitted by Davis' counsel, and the written response submitted

by Raintree, to calculate what amount would be considered a reasonable fee. Based on this evidence, the ALJ reduced the hourly rate requested for two of Davis' attorneys, rejected the request for a fee multiplier, and reduced the requested amount of $42,909.98 to an award of $28,956.50. The Commission affirmed this recommendation. We hold that the ALJ did not err in failing to hold a hearing on Davis' petition for attorney fees.

For the foregoing reasons, we affirm the judgment of the appellate court.

*Affirmed.*

CHIEF JUSTICE BILANDIC, specially concurring:

I concur in the plurality opinion except for its discussion of two issues.

First, the plurality needlessly restricts the definition of "contagious" or "infectious" disease in section 300.650(a)(4) of the public health regulations to those diseases actually listed in section 690.100 of the regulations. 173 Ill. 2d at 485-88. The plurality states that because section 690.100 did not list HIV as being a "contagious" or "infectious" disease at the time of Davis' discharge, then HIV infection was not considered, for purposes of section 300.650(a)(4), to be a "contagious" or "infectious" disease.[1] In my view, the plurality thereby unnecessarily and unwisely limits the term "contagious" or "infectious" disease as used in section 300.650(a)(4). This case can be resolved without the potentially far-reaching holding that if a disease is not listed in section 690.100, then it is not considered to be "contagious" or "infectious" under section 300.650(a)(4).

As the plurality later concludes, Raintree's argument that it was required to discharge Davis pursuant

---

[1]Section 690.100 of the regulations has since been amended to include HIV infection as a "contagious" or "infectious" disease. 77 Ill. Adm. Code § 690.100 (1996).

to section 300.650(a)(4) fails even if HIV was a "contagious" or "infectious" disease within that section because Raintree failed to comply with the provisions of that section. 173 Ill. 2d at 488-89. Section 300.650(a)(4) expressly allows employees diagnosed as having "contagious" or "infectious" diseases to return to work after obtaining a doctor's note stating that the disease "is no longer contagious or found to be noninfectious." In this case, Davis obtained a note from his doctor explaining that his HIV status did not prevent him from performing his job as a cook and that HIV was not transmitted through food preparation or service. Raintree was informed by the Evanston board of health that the note was inadequate. Under these circumstances, the plurality opinion finds that Raintree should have contacted Davis to give him a chance to comply with any further requirements necessary for him to return to work and also should have conducted its own investigation to determine whether it was safe for Davis to return to his position as a cook. Raintree, however, did nothing in response to Davis' note. Raintree therefore did not comply with section 300.650(a)(4). Raintree's argument that it was compelled to commit a discriminatory employment action in order to comply with the public health regulations therefore fails even if HIV was a "contagious" or "infectious" disease within the meaning of those regulations.

Limiting the definition of "contagious" or "infectious" disease, as the plurality opinion does, is not only unnecessary, it is also ill-advised. New diseases may develop that are "contagious" or "infectious." An employer should not be precluded from relying on section 300.650(a)(4) to protect the public health merely because such disease has not yet been listed in section 690.100.

Second, I do not join in the plurality's broad holding

that a good-faith defense to liability does not exist for violations of the Human Rights Act. 173 Ill. 2d at 489-91. I would not resolve in this case whether the Human Rights Act bars all good-faith defenses to liability. Like the plurality, I agree that the facts of this case show that Raintree did not act in good faith. 173 Ill. 2d at 491-93. I would therefore limit this court's holding to only the facts of this case.

For these reasons, I do not join in either of the aforementioned discussions.

JUSTICES MILLER, HEIPLE and McMORROW join in this special concurrence.