CONSOLIDATED RAIL CORPORATION *et al.*, Plaintiffs-Appellants, v. THE DEPARTMENT OF REVENUE, Defendant-Appellee.

First District (2nd Division)    No. 1—96—1395

Opinion filed December 9, 1997.

Lord, Bissell & Brook, of Chicago (David R. Schmidt, Hugh C. Griffin, John M. Hughes, and Stephanie A. Burris, of counsel), for appellants.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and A. Benjamin Goldgar, Assistant Attorney General, of counsel), for appellee.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Plaintiff, Consolidated Rail Corporation (Conrail), appeals from a determination of tax deficiency made by defendant, the Department of Revenue, which disallowed Conrail from carrying forward a $125 million Illinois net loss as a deduction. Defendant based its denial upon the Conrail Privatization Act (45 U.S.C. § 1301 *et seq.* (Supp. 1987)), a federal statute that directed the public sale of the corporation and thereafter treated Conrail as a new corporation for federal tax purposes, thereby prohibiting Conrail from carrying forward its presale net operating losses. The circuit court of Cook County upheld defendant's determination. On appeal, plaintiff argues that the circuit court erred in upholding defendant's disallowance on the grounds that: (1) the "deemed sale" provisions of the federal statute did not truly create a *bona fide* new corporation for purposes of Illinois income tax law; and (2) net losses allowed under Illinois law are not subject to the federal limitations on federal net operating losses.

BACKGROUND

Conrail and its subsidiaries are engaged in the business of hauling freight by rail primarily throughout 14 northeastern and midwestern states. During the 1970s, seven railroads in those regions went bankrupt, and Congress reacted to the potential transportation crisis by passing the Regional Rail Reorganization Act of 1973 (45 U.S.C. § 701 *et seq.* (Supp. 1987)). This act established the United States Railway Association (USRA) and Conrail, a for-profit, quasi-governmental corporation. The USRA had several directives, including deciding upon a final plan for the transfer of the rail properties of the bankrupt railroads to Conrail. Conrail, in turn, was responsible for receiving the properties from the USRA and operating rail service thereon. In 1975, Congress accepted the USRA's final system plan, incorporated Conrail as a Pennsylvania corporation, and commenced operations in 1976, with the United States owning 85% of Conrail's common stock and Conrail employees owning the remaining 15% through an employee stock ownership plan.

During its first seven years, Conrail proved to be highly unprofitable, despite receiving billions of dollars of assistance from Congress. The corporation declared enormous losses on its federal income tax returns from 1976 through 1982, resulting in an accumulated net

operating loss of $2.2 billion during that period. Congress once again reacted with support by passing the Northeast Rail Service Act of 1981 (NERSA) (45 U.S.C. § 1101 *et seq.* (Supp. 1987)), which amended portions of the Regional Rail Reorganization Act by exempting Conrail from liability for any state taxes (45 U.S.C. § 727(c) (Supp. 1987)) and requiring the Secretary of Transportation to make arrangements for the sale of the government's interest in Conrail (45 U.S.C. § 761 (Supp. 1987) (repealed 1986)). After NERSA was implemented, Conrail began to improve and reported taxable income between $2 million and $314 million each year from 1983 through 1986.

In light of its $7 billion investment in Conrail and the corporation's proven viability, Congress passed the Conrail Privatization Act (CPA) in October 1986. 45 U.S.C. § 1301 *et seq.* (Supp. 1987). Under the CPA, the Secretary of Transportation was to sell the United States' common stock in Conrail via a public offering. 45 U.S.C. §§ 1311, 1312 (Supp. 1987). The CPA also provided for special tax treatment of the public sale of Conrail, stating: "For periods after the public sale, for purposes of Title 26, Conrail shall be treated as a new corporation which purchased all of its assets as of the beginning of the day after the date of the public sale for an amount equal to the deemed purchase price." 45 U.S.C. § 1347(a)(1) (Supp. 1987). The CPA further provided that Conrail's exemption from state tax liability would be extinguished with respect to taxable years commencing after December 31, 1986. 45 U.S.C. § 727(c) (Supp. 1987). The public offering was settled on April 2, 1987.

Since the CPA required Conrail to be treated as a new corporation for purposes of the Internal Revenue Code, Conrail filed a final "short year" federal income tax return for the period January 1, 1987, through the settlement date of the public sale, April 2, 1987 (April 2 federal return). The corporation also filed an Illinois tax return for the same period (April 2 Illinois return). On the April 2 federal return, Conrail reported a $2.9 billion loss for that period. This same loss was reported on its April 2 Illinois return, which resulted in an Illinois net loss of $125,022,130 based on that portion of Conrail's operations conducted in Illinois.

In March of 1987, Conrail's board of directors adopted a resolution establishing a new fiscal year ending April 30. Consequently, the corporation filed another "short year" federal return for the period April 3, 1987, through April 30, 1987 (April 30 federal return), as well as an Illinois return for that period (April 30 Illinois return). Conrail declared a loss of $46 million on the April 30 federal return, which resulted in an apportioned Illinois net loss of $1,845,343 for the April 30 Illinois return. In addition, Conrail sought to carry

forward and report as part of its total Illinois net loss a portion of the presale $125 million loss from its April 2 Illinois return.

For the period May 1, 1987, through April 30, 1988, Conrail filed a federal return (1988 federal return) upon which the corporation reported approximately $188 million in taxable income. This same taxable income was declared on its 1988 Illinois return, which resulted in an Illinois base income of approximately $7.2 million for that period. On that 1988 Illinois return, Conrail carried forward its Illinois net loss of $1,845,343 from the previous April 30 Illinois return. In addition, Conrail once again carried forward a portion of its presale Illinois net loss of $125 million from the April 2 Illinois return. By setting off these deductions against its net income, Conrail was able to reduce its Illinois net income to zero and avoid any payment of taxes from its 1988 Illinois return. Conrail achieved the same result from its 1989 Illinois return, where it again carried forward its net losses from its presale April 2 Illinois return and its April 30 Illinois return.

In 1990, the Department of Revenue (Department) audited Conrail's postsale tax returns and concluded that, based on the federal tax treatment of Conrail prohibiting any carryover of presale net operating losses, the corporation would not be allowed to carry forward its presale Illinois net loss of $125 million. The Department did, however, allow Conrail to carry forward its postsale $1.8 million net loss from its April 30 Illinois return to offset income for 1988 (but not for 1989, as the entire deduction was used in 1988). As a result, without the carryover of Conrail's presale Illinois net loss, the Department concluded that Conrail owed $1,276,679, consisting of $1,113,780 in unpaid taxes and $162,899 in penalties.

Conrail filed protests contesting the Department's notices of deficiency, and an administrative hearing was held by the Department in 1993. The administrative law judge issued a recommendation for disposition stating that the Department's conclusion should be followed and that the same bases for the federal government's decision to prohibit Conrail from carrying forward its presale federal net operating losses into postsale tax years also applied to the context of Illinois net losses. The Department, therefore, upheld its position, and Conrail filed a complaint for administrative review in the circuit court. The circuit court issued a memorandum decision and order affirming the Department's conclusion on the merits but vacating its decision as to the penalties. The Department followed the circuit court's decision and imposed no penalties, after which the court entered judgment in the Department's favor in March 1996. Conrail now appeals the judgment of the circuit court.

We affirm.

ANALYSIS

We note that the parties present no factual disputes and that only the legal issues presented are in controversy. Consequently, this court is not bound by the administrative agency's conclusions of law and statutory construction and will review those decisions *de novo*. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479 (1996); *Thomas M. Madden & Co. v. Department of Revenue*, 272 Ill. App. 3d 212, 215, 651 N.E.2d 218, 220 (1995). We do, however, acknowledge the deference that Illinois courts may give to administrative agencies' interpretations and enforcement of statutes, as they often have considerable experience and expertise in making informed judgments upon the issues before them. *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 398 (1994), citing *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 97-98 (1992).

I

■ Plaintiff first contends that the Conrail Privatization Act did not factually or legally create a new corporation for all purposes. Plaintiff argues that the administrative law judge and the circuit court took the legal fiction of an "old" and "new" Conrail—a concept established in the "deemed sale" provisions of the CPA for federal tax purposes—and erroneously applied that fiction to Illinois income tax law. Plaintiff concedes that the tax treatment provision of the CPA has barred Conrail from carrying forward any of its *federal* net operating losses from tax years preceding the sale. Plaintiff insists, however, that any such prohibition on carryovers is limited exclusively to the federal tax realm and argues that, since Conrail has, in reality, undergone only trivial corporate change, this reveals that the fiction of an "old" and "new" Conrail was created only to facilitate the federal directives delineated in the CPA.

In support of this position, plaintiff states that the only significant change that occurred to Conrail was the transfer of ownership of 85% of the corporation's stock. Plaintiff contends that this shift in ownership had no effect upon the continued success of the corporation and that Conrail remained the same business with the same rail properties, employees, corporate charter, articles of incorporation, and tax identification number. Plaintiff's assertion, however, is not entirely accurate. The CPA called for a number of important changes to Conrail, including the termination of the USRA, the cancellation of all of Conrail's governmental liabilities, as well as the gradual

replacement of its board of directors. Furthermore, Conrail's articles of incorporation were amended to reflect, among other things, new restrictions on capital expenditures, ownership, and the corporation's fundamental purpose.

Plaintiff's argument for separate tax treatment in Illinois based on the reality that Conrail remained the same corporation is ultimately deflated by the language of the CPA; language which reveals that Congress was fully aware that Conrail would remain essentially the same corporation. By providing that, "for purposes of [federal taxation], Conrail shall be *treated as* a new corporation" after the public sale, Congress implicitly acknowledged that it was not, in fact, creating a new entity. (Emphasis added.) 45 U.S.C. § 1347(a)(1) (Supp. 1987). Indeed, the creation of section 1347(a)(1) shows that, while the government wanted Conrail to continue its operations as before, Congress expressly intended for the corporation to receive new tax treatment. This is supported by the various provisions of the CPA affecting a major reconstitution of the corporation's financial attributes; in particular, Congress' decision to treat the sale of stock as a sale of assets in accordance with an election under section 338 of the Internal Revenue Code, and its decision to allow a significant reduction in the book value of the "new" Conrail from that of the "old" Conrail. These measures undoubtedly were taken to ensure that Conrail would be financially independent of the federal government. Further proof of Congress' intent to give sweeping new tax treatment to Conrail is found in the temporary federal regulations promulgated by the Treasury Department pursuant to the CPA, which make a fundamental distinction between the "old" and "new" Conrail: "The term *new Conrail* means Conrail, on the purchase date and for all periods thereafter. New Conrail shall be treated as unrelated to old Conrail *for all purposes*." (Emphasis added.) Temp. Treas. Reg. § 18.0 (1987). Consequently, we hold that plaintiff's focus on dismantling the fiction of an "old" and "new" Conrail is an unpersuasive basis for arguing that Conrail should be allowed to carry forward its presale Illinois net losses.

## II

■ Plaintiff also contends that the CPA's tax treatment of Conrail does not apply to the Illinois tax regime on the grounds that a particular provision under Illinois law prevails over the federal statute. Specifically, plaintiff relies on section 207 of the Illinois Income Tax Act (35 ILCS 5/101 *et seq.* (West 1992)), which provides for the carryover deduction of a taxpayer's Illinois net losses. Section 207 states, in pertinent part: "If after applying all of the modifications provided

for in paragraph (2) of Section 203(b) ***, the taxpayer's net income results in a loss, such loss shall be allowed as a carryover or carryback deduction in the manner allowed under Section 172 of the Internal Revenue Code." 35 ILCS 5/207(a) (West 1992). Plaintiff reads this provision as being silent on the issue of whether federal limitations on net operating losses apply to Illinois net losses. Plaintiff further argues that, since there is a difference between the computation of federal net operating losses and Illinois net losses, the allowance for carryover of Illinois net losses is unaffected by federal limitations on net operating loss carryovers.

Plaintiff attempts to support its position by referring to the Department's own regulations concerning Illinois net loss computations. As plaintiff points out, Regulation 100.2300(b) differentiates between "Illinois net loss" and federal "net operating loss." 86 Ill. Adm. Code § 100.2300(b) (1996). Plaintiff further illustrates that the computation of Illinois net losses is fundamentally different from that of federal net operating losses, which is evidenced by the fact that a taxpayer is capable of taking an Illinois net loss deduction despite not having a federal net operating loss for the same tax period. In addition, plaintiff makes reference to an issue of the Department's own newsletter, *Taxation Today*, which characterized section 207 as having "decoupled" the Illinois Income Tax Act from the Internal Revenue Code with respect to the computation of Illinois net losses. *Taxation Today*, Dept. of Rev. Newsltr., par. 400—236, at 22,430—32 (C.C.H.) (Spring 1987).

We believe, however, that plaintiff's argument based on section 207 is specious. We agree with the administrative law judge's conclusion that a line of reasoning grounded in section 207 is irrelevant to the central issue of whether plaintiff should be allowed to carry forward its presale Illinois net losses. Indeed, we find that section 207 speaks to the issue of *computation* of net losses and does not bring any clarity to the relevant question at bar: whether a "new" corporation, which purchased all of its predecessor's assets whose net operating losses were nullified for federal taxation purposes, can carry forward those losses for purposes of Illinois taxation. Therefore, we do not find it necessary to analyze the extent to which section 207 mirrors or differs from federal tax laws, for even if section 207 were found to be genuinely independent from the Internal Revenue Code, such a conclusion would only go to the issue of the manner in which Illinois net losses are calculated.

Instead, we choose to focus on the propriety of the Department's decision to follow the mandate of the CPA in light of the absence of Illinois legislation concerning the tax treatment of Conrail. Since the

Illinois General Assembly passed no special legislation to conform with the CPA, and Congress drafted the federal statute in terms of *federal* tax treatment of Conrail, the Department arguably had no binding statute upon which to base its decision to deny plaintiff's presale Illinois net loss carryover. We note, however, that the Department did not need special statutory authority to render its decision. We believe, therefore, that, in the absence of clear statutory authority, reference to the legislative history of the CPA is proper. See *In re B.C.*, 176 Ill. 2d 536, 542-43 (1997) (where the meaning of a statute is unclear from the statutory language itself, the court may look beyond the language and consider the purpose of the law, the evils the law was designed to remedy, and legislative history to discern legislative intent); see also *People v. Jameson*, 162 Ill. 2d 282, 288 (1994).

One example that further illustrates Congress' intent to divorce Conrail from further government subsidies and place it on the tax rolls of the states in which it operates is found in the congressional reports preceding the CPA's enactment, which state, in part:

"Conrail will be treated as a new corporation that purchased the assets after the public sale. Thus, the aggregate basis for Conrail's assets will be adjusted to reflect the stock purchase price (plus liabilities and other relevant items). Similarly, *no NOL or other carryovers* from periods before the public sale will be available for use in postsale periods." (Emphasis added.) H.R. Conf. Rep. No. 99—1012, at 373 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3868, 4018.

While we do not propose that the words "no NOL or other carryovers" necessarily include Illinois net loss carryovers, we believe that they do reveal the importance that Congress placed on making clear that Conrail was no longer to benefit from or perpetuate its previous tax attributes.

Indeed, our assessment of the congressional intent behind the CPA reveals that the federal government intended for Conrail to fully achieve the status of a private corporation, free of government control and special tax benefits. Plaintiff's position, on the other hand, calls for us to allow the private, "new" Conrail to enjoy tax benefits that are unavailable to other private corporations conducting business in Illinois. We agree with the circuit court's point that, "[h]ad Congress expressly declared the dissolution of the Old Conrail at the time of the sale, and the simultaneous creation of the New Conrail, without doubt, that new entity would not succeed to the presale operating losses for purposes of federal or state taxation." *Consolidated R. Corp. v. Department of Revenue*, No. 94—L—50653, Memorandum Dec. and Order at 13 (March 22, 1996). Congress' privatization of Conrail essentially by means of an election under sec-

tion 338 of the Internal Revenue Code was no less legitimate than an actual, simultaneous corporate dissolution and formation. The fact that Congress terminated plaintiff's exemption from state tax liability after the public sale and provided for special tax treatment in the CPA to bring Conrail in line with a truly private corporation's tax attributes further supports our conclusion that the Department's treatment of Conrail was proper.

This decision is supported not only by the aforementioned congressional authority, but by relevant portions of the Illinois Income Tax Act itself. Section 401(a) states that "[f]or purposes of the tax imposed by this Act, the taxable year of a person shall be the same as the taxable year of such person for federal income tax purposes." 35 ILCS 5/401(a) (West 1992). In the case at bar, plaintiff filed a "final" April 2 federal return in recognition of the fact that the CPA created an "old" and "new" Conrail as of April 2, 1987. Likewise, plaintiff designated its April 30 federal tax return as its "initial return," consistent with the notion that Conrail had taken on new tax attributes as of the settlement date of the public sale. When viewed in light of section 401(a), we find that plaintiff was not free to disregard its federal designations of "final" and "initial" returns in the context of Illinois taxation. That is, we read section 401(a) to mean that, when one files a federal return for a certain period, the taxpayer's Illinois return must be filed for a period that is consistent with any designations made pursuant to federal law.

Further support of the Department's decision is found in section 403(a) of the Illinois Income Tax Act, which states:

> "To the extent not inconsistent with the provisions of this Act ***, each person making a return under this Act shall take into account the items of income, deduction and exclusion on such return in the same manner and amounts *as reflected in such person's federal income tax return for the same taxable year*." (Emphasis added.) 35 ILCS 5/403(a) (West 1992).

We believe that section 403(a) not only reveals the Illinois legislature's intention that Illinois tax law generally coincide with the Internal Revenue Code, but it also supports the conclusion that an Illinois taxpayer must retain the same tax attributes used in claiming federal deductions when claiming similar deductions on its Illinois returns. A contrary result would mean that a taxpayer could assume one identity with certain traits for federal purposes and assume another identity with drastically different tax attributes for Illinois tax purposes. Such a practice, however, would contravene both the general spirit and express language of the Illinois Income Tax Act. We find, therefore, that the federal characterization of Conrail as being a

"new" corporation for tax purposes—thereby prohibiting it from carrying over presale net losses—applies in the context of Illinois taxation.

We also note that the allowance of a deduction for net losses is a privilege created by statute as a matter of legislative benevolence. *Bodine Electric Co. v. Allphin*, 81 Ill. 2d 502, 512-13 (1980), *aff'g* 70 Ill. App. 3d 844, 850, 389 N.E.2d 168, 173 (1979), citing *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 235, 99 L. Ed. 1024, 1028, 75 S. Ct. 733, 736 (1955). As a consequence, Illinois courts have determined that issues concerning deductions are to be strictly construed in favor of taxation. *Chen v. Department of Revenue*, 196 Ill. App. 3d 583, 589, 554 N.E.2d 428, 431-32 (1990), citing *Balla v. Department of Revenue*, 96 Ill. App. 3d 293, 295, 421 N.E.2d 236, 238 (1981). Likewise, Illinois courts have established that a taxpayer is not entitled to a deduction absent a showing that the deduction is clearly allowed by statute, the burden of such a showing resting upon the taxpayer. *Bodine*, 81 Ill. 2d at 513; *Chen*, 196 Ill. App. 3d at 589, 554 N.E.2d at 431. We are not convinced that plaintiff has met this burden in the case at bar, as plaintiff cites no authority which supports its position that, following a fundamental corporate change pursuant to a section 338 election, an entity is allowed to succeed to or retain certain tax attributes, such as net losses, for state purposes when such characteristics are patently extinguished for purposes of federal taxation.

Accordingly, we affirm the decision of the circuit court.

Affirmed.

CAHILL and LEAVITT, JJ., concur.