LAKE POINT TOWER, LTD., Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (4th Division)    No. 1—96—3008

Opinion filed August 28, 1997.

Mark D. DeBofsky and Richard Q. Holloway, both of DeBofsky & DeBofsky, of Chicago, for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Laura M. Wunder, Assistant Attorney General, of counsel), for respondents Human Rights Commission and Department of Human Rights.

Rotman, Medansky & Elovitz, Ltd., of Chicago (Louis S. Elovitz, of counsel), for respondent Dorothy Johnson.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

The Illinois Human Rights Act provides that adverse employment actions cannot be taken against any person due to his or her physical handicap if the handicap is unrelated to the person's ability to perform job duties. In this case, Dorothy Johnson suffered from a form of cancer. Her employer, Lake Point Tower, Ltd., knew it. She was fired.

We must answer two questions: First, is cancer a physical handicap within the meaning of the Illinois Human Rights Act (Act) (775 ILCS 5/1—101 *et seq.* (West 1992))? Second, if it is, did Lake Point Tower, Ltd., violate the Act when it fired Dorothy Johnson?

We find the Illinois Human Rights Commission (Commission) correctly decided cancer is a physical handicap and that Lake Point Tower was guilty of unlawful employment discrimination.

FACTS

Dorothy Johnson (Johnson) filed a charge of discrimination with the Illinois Department of Human Rights (DHR), claiming that she had been terminated by Lake Point Tower, Ltd. (Lake Point), because she had cancer. This, she said, was a violation of the Illinois Human Rights Act. 775 ILCS 5/1—101 *et seq.* (West 1992). The DHR made a finding of substantial evidence for the claim and filed a complaint on Johnson's behalf with the Illinois Human Rights Commission. A public hearing was held before an administrative law judge (ALJ) on May 12, 1994.

At the hearing, Johnson testified she began employment with Lake Point in June 1983, as a part-time health spa attendant. A year later, in June 1984, Johnson was promoted to a full-time position as health spa manager. She was put in charge of payroll, billing, and staffing. She supervised between five and eight employees. Her salary was $8 per hour.

In addition to her managerial position, Johnson and another employee shared the responsibility of cleaning the spa. This additional job paid $900 a month. She received half of this amount, or $450 a month for her share.

In June 1986, Johnson was diagnosed with non-Hodgkins lymphoma, a form of cancer. Johnson immediately informed her supervisor, Herb Salberg, who had the title of "Spa Consultant." Johnson underwent an operation to have some lymph nodes removed. While she was recuperating at home, she received phone calls from spa members and other Lake Point employees, as well as a "Get Well" card signed by over 100 persons. The card included $500 that had been collected for her. It was common knowledge around Lake Point that Johnson had cancer.

Johnson's doctor, Dr. Winter, gave an evidence deposition and prepared a written summary of Johnson's medical history. These documents were entered into evidence and showed that Johnson was relatively asymptomatic in 1986 and 1987. Her cancer was diagnosed as "indolent," meaning slow growing or slowly progressing. Though Johnson sometimes complained of swollen glands, fatigue, malaise, and some pain or discomfort, her health was generally good. Johnson remained able to swim, work out, and perform all of the duties of her employment. In fact, Johnson's ability to perform her duties was not contested but was stipulated by the parties.

In September 1987, based on a performance review by her supervisor, Herb Salberg, Johnson received a salary increase. Shortly after, in late September or early October, Johnson advised Salberg that chemotherapy was being suggested by her doctors and she was considering the possibility of undergoing this treatment.

On October 1, 1987, Thomas Rottman was promoted from leasing agent to general operations manager for Lake Point. He became Salberg's supervisor. On October 9, 1987, Johnson was notified that she was being terminated. Johnson testified that Salberg came to her apartment to give her the news of her termination. Though she repeatedly asked Salberg the reason for her termination, he would not tell her. He did tell her, however, that he told Rottman about her cancer.

The day after Johnson was terminated, Mike Flynn, another employee at Lake Point, came to Johnson's apartment. He needed help completing the billing accounts and payroll for Lake Point. Johnson agreed to help. Johnson said that Flynn told her she had been terminated because she had cancer.

Thomas Rottman, the general manager for Lake Point, testified that he gave Salberg the order to fire Johnson but claimed he had no input into the decision. That decision, he said, was made by one of the owners, Evangeline Gouletas. Rottman also claimed he did not know about Johnson's cancer until after her termination. He denied her cancer was the reason for her termination.

Rottman admitted, however, that Johnson's personnel file contained no written reprimands or warning letters. He could not say why she was terminated. Though he was told there were some complaints about the running of the spa, he never received any direct complaints about Johnson's performance.

Evangeline Gouletas, who co-owned Lake Point along with her brother, testified that she used the health spa in 1987 and found Johnson to be somewhat rude and unfriendly. She claimed, however, that she had almost no input into the day-to-day decision-making for Lake Point and denied that she had been the one to decide that Johnson was to be terminated. She said she did not know the reason for Johnson's termination but claimed it was not because of her cancer. Gouletas also denied she was aware of Johnson's illness before her termination.

The ALJ issued a decision in favor of Johnson and recommended that she be awarded damages, attorney fees, and costs. The ALJ found Johnson proved that Lake Point had discriminated against her because of her physical handicap of cancer. Damages, fees, and costs were recommended as follows: $51,894.09 for back pay; $2,613 as reimbursement for health insurance premiums Johnson paid; $15,816.25 for attorney fees; and $320.65 for costs.

Lake Point filed exceptions to the ALJ's decision with the Commission. Johnson responded. Both parties had an opportunity to present oral argument to the Commission. Thereafter, a final order was

issued by the Commission, affirming the ALJ's decision. The Commission concluded it was not against the manifest weight of the evidence for the ALJ to have found that Johnson made a *prima facie* case of discrimination. Lake Point's failure to provide any reason for Johnson's termination, said the Commission, entitled Johnson to prevail as a matter of law. The Commission adopted all of the ALJ's recommendations with regard to damages, fees, and costs.

Lake Point petitioned this court for review pursuant to Supreme Court Rule 335 (155 Ill. 2d R. 335).

DECISION

■ Section 8—111 of the Illinois Human Rights Act (775 ILCS 5/8—111(A)(1) (West 1992)) provides that "any complainant or respondent may apply for and obtain judicial review of a final order of the Commission entered under this Act by filing a petition for review in the Appellate Court within 35 days" of the date when the decision was served on the party. This section also provides, in paragraph (A)(2), that "the Commission's findings of fact shall be sustained unless the court determines that such findings are contrary to the manifest weight of the evidence." 775 ILCS 5/8—111(A)(2) (West 1992). To affirm a Commission finding, a court must find the final decision just and reasonable in light of all the evidence. *Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n*, 181 Ill. App. 3d 122, 136, 536 N.E.2d 932 (1989).

■ As with any administrative review action, the scope of judicial review is limited. A court may not reweigh the evidence or substitute its own judgment for that of the Commission. *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136. The same deference is not given to conclusions of law or statutory construction. These matters are independently reviewed by the court. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479, 672 N.E.2d 1136 (1996).

■ Employment discrimination claims brought under the Human Rights Act are analyzed according to the three-step approach set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and adopted by our supreme court in *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684 (1989).

First, the employee must establish, by a preponderance of the evidence, a *prima facie* case of unlawful discrimination. If the employee succeeds, a rebuttable presumption of unlawful discrimination is created. In step two, the burden of production of evidence shifts to the employer. To rebut the presumption of discrimination, the employer must articulate, but need not prove, a legitimate, nondiscriminatory

reason for its action against the employee. If the employer presents enough evidence of good reason, the burden is on the employee in the third step. Here, the employee must show by a preponderance of the evidence that the reasons offered by the employer are not the true reasons but are a pretext for unlawful discrimination. *Raintree Health Care Center v. Human Rights Comm'n*, 173 Ill. 2d at 481; *Cisco Trucking Co. v. Human Rights Comm'n*, 274 Ill. App. 3d 72, 653 N.E.2d 986 (1995).

■ To establish a *prima facie* case of discrimination, an employee must show (1) that he/she is handicapped within the definition of the Act, (2) that an adverse action was taken against the employee due to his/her handicap, and (3) that the handicap is unrelated to the employee's ability to perform the functions of his/her job. *Cisco Trucking Co.*, 274 Ill. App. 3d at 74.

In the present case, the third element of a *prima facie* case—that Johnson's cancer was unrelated to her ability to perform her duties—was stipulated by the parties and is not at issue. Lake Point, however, questions whether Johnson has succeeded in proving the other two elements. Lake Point contends that Johnson's cancer is not a "handicap" as that term is defined in the Act. But even if it is a handicap, Lake Point contends, Johnson failed to prove her termination was related to her cancer.

1. Is Cancer a Handicap?

■ "Handicap" is defined in the Act at paragraph (I) of section 1—103:

" 'Handicap' means a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic:

(1) For purposes of Article 2 is unrelated to the person's ability to perform the duties of a particular job or position." 775 ILCS 5/1—103(I) (West 1992).

The Commission's interpretive rules provide further insight:

"(1) The definition [of handicap] is not confined to only those physical and mental conditions which are grave or extreme in nature. However, it is interpreted as excluding:

(A) conditions which are transitory and insubstantial, and

(B) conditions which are not significantly debilitating or disfiguring.

(2) To be covered, a condition must be determinable by recog-

nized \*\*\* diagnostic techniques." 56 Ill. Adm. Code § 2500.20(b) (1996).

More significantly, section 2500.30(b) of the Administrative Code states that a person with a history of cancer is protected against handicap discrimination based on that history. 56 Ill. Adm. Code § 2500.30(b) (1996). Specifically, the provision states:

> "An individual has a 'history' of a handicapping condition if he/she is restored or recovered from a prior affliction or if the individual's symptoms are in remission. The mentally restored, those who have had heart attacks or *cancer*, and persons with orthopedic findings may be examples; they are protected against discrimination which is based upon their medical histories." (Emphasis added.)

Before July 1, 1980, Illinois courts defined "handicap" as something that required a person to be severely limited in performing major life functions. *Lyons v. Heritage House Restaurants, Inc.*, 89 Ill. 2d 163, 432 N.E.2d 270 (1982) (employee suffering from early stages of uterine cancer was not "handicapped" within the meaning of the Equal Opportunities for Handicapped Act). The definition under the Federal Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 *et seq.* (1994)) was similar—"The ADA requires that the impairment substantially limit one or more of the individual's major life activities." *Gordon v. E.L. Hamm & Associates*, 100 F.3d 907, 911 (11th Cir. 1996).

Lake Point urges us to apply the *Lyons* and ADA definitions in this case. Of course, we cannot. Recognizing that the definition of "handicap" was too restrictive, the legislature enacted the Human Rights Act in 1980.

The new Act changed the definition of "handicap." It eliminated the reference to limitations on major life activities. That change furthered a policy that protects handicapped persons. An employer now cannot defend a firing by saying the employee was not suffering enough from his or her disease. Handicapped employees are protected from an untenable catch 22—a requirement that a major life function be severely limited by a handicap that is unrelated to the employee's ability to perform job duties. That approach would swallow the statute and destroy its salutary policy.

The ADA cases have no relevance here. In *Lyons* the court plainly said the 1980 Human Rights Act "uses a substantially different definition" for the term "handicapped." *Lyons*, 89 Ill. 2d at 165. Lake Point will have to accept the definition contained in the Act, in the Commission's regulations, and in the relevant reported decisions.

The plain language of the statute clearly states that a person is

handicapped if he/she has "a determinable physical or mental characteristic *** which may result from disease." 775 ILCS 5/1—103(I) (West 1994). This Human Rights Act definition of a "handicapped" person has been interpreted to include an employee diagnosed with HIV (*Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 672 N.E.2d 1136 (1996)); an employee who suffered from dysmenhorrea due to endometriosis (*Illinois Bell Telephone Co. v. Human Rights Comm'n*, 190 Ill. App. 3d 1036, 547 N.E.2d 499 (1989)); and an employee who had a history of heart disease but had recovered (*Kenall Manufacturing Co. v. Human Rights Comm'n*, 152 Ill. App. 3d 695, 504 N.E.2d 805 (1987)).

The Commission, the agency entrusted with interpreting and administering the Act, has repeatedly expressed its belief that cancer is a handicap within the meaning of the Act. In a number of administrative decisions, the Commission has stated:

> "With many claims of physical handicap, it is relatively easy to identify the cause of the handicapping condition. If someone is deaf, blind, cannot walk or speak, or suffers from a well known disease such as *cancer*, asthma, or renal failure, it is apparent that the person so afflicted has a condition which rises to the level of a physical handicap and thus is entitled to protection under the Act." (Emphasis added.)

See *In the Matter of Francisco R. Carlin v. Edsal Manufacturing Co.*, Ill. Hum. Rts. Comm'n Rep. No. 1992CN3428; *In the Matter of Sheila Jackson v. Evanston Hospital Corp.*, Ill. Hum. Rts. Comm'n Rep. No. 1991CN2519.

■ We see at least two, possibly three ways the Commission could have found Johnson suffered from a handicap as defined by the Act.

First, she is currently afflicted with a condition "which constitutes a handicap." True, it is not yet fully debilitating, but the Act does not require complete debilitation. It requires that the disease not be transitory or insubstantial.

Johnson's form of cancer affects her lymph nodes, which enlarge at times. Lymph nodes are an important part of the body's immune system because of their role in fighting infection. Some of her lymph nodes have been surgically removed. She suffers pain, fatigue, and malaise. She will require chemotherapy. Although Johnson's doctor described the disease as "waxing and waning," there is nothing trivial or insubstantial about it. It is slowly and inexorably progressing. The disease is serious and people often die from it. That is a "handicap."

While Johnson currently is afflicted with a handicap, her condition fits another part of the definition of "handicap" within the Act.

She has a "history of handicap." The Act protects someone with a history of handicap, even though he or she is not currently afflicted.

In *Kenall Manufacturing Co. v. Human Rights Comm'n*, 152 Ill. App. 3d 695, 504 N.E.2d 805 (1987), an employee was fired just after he returned to work following a heart attack. He had been on disability leave for six months but was feeling well when he returned to work. We held the employee's history of a heart condition, even though he seemed to be fully recovered, could bring him under the statutory definition of a handicapped person.

Here, Lake Point knew about Johnson's cancer. It knew she had undergone surgery and probably would have to undergo chemotherapy in the future. While Lake Point rightly could have believed Johnson would require extensive treatment in the future, acting on that economically based concern for what might happen was prohibited employment discrimination.

The Act offers a third way the Commission could, but expressly did not, find Johnson had a handicap. If the employer perceives the employee as handicapped, rightly or wrongly, then acts against the employee based on that perception, the Act has been violated. *Kenall Manufacturing Co.*, 152 Ill. App. 3d at 703.

Lake Point contended here and at the Commission that Johnson's disease was not serious. Given Johnson's testimony, including the prospect of chemotherapy, the Commission might well have concluded Johnson was fired because Lake Point at that time perceived the existence of a handicap. However, since the Commission expressly found this case did not involve the "perception" element of the Act, there is no need to dwell further on this third way.

That is, because it is clear to us the Commission correctly found Johnson had a presently handicapping condition, there is no need to discuss the obvious fact that cancer is a stigmatizing disease. "[T]here is little question that cancer history raises barriers to employment opportunities." *Burris v. City of Phoenix*, 179 Ariz. 35, 39, 875 P.2d 1340, 1344 (1993). Resting at the core of the Act is a challenge to ignorance and irrational fear in the workplace. That is good law and good policy.

We hold that cancer is a handicap within the meaning of the Act. Johnson, having been afflicted with a form of cancer, was "handicapped" and entitled to protection under the Act.

2. Was Johnson's termination due to her cancer?

■ In this case Johnson was diagnosed with cancer in June 1986, but she was not terminated until October 1987. The ALJ found that the delay between the diagnosis and the adverse action was not sig-

nificant. The specter of chemotherapy was not raised until September 1987. Rottman was named the new general manager on October 1, 1987.

The ALJ found that "the mention of chemotherapy was close enough in time to the discharge to at least raise the inference that there was a connection between the two events." But even "more convincing," said the ALJ, was the correlation between Johnson's discharge and the arrival of Rottman as general manager.

The ALJ rejected as "incredible" Rottman's claim that he was unaware of Johnson's condition. We agree with that characterization. The fact that Johnson was given a rather significant raise just one month before her termination and then, within days of Rottman's promotion, was discharged without any reasons given, strongly suggested to the ALJ that there was some link between Johnson's cancer and her dismissal. We agree.

It appears from Johnson's testimony that her condition was common knowledge at Lake Point. Employees outside the spa were aware that she was diagnosed with cancer and underwent some biopsy surgery. Over 100 people signed a card and contributed to a gift. The ALJ's finding that Rottman and Gouletas were not credible when they claimed to be unaware of Johnson's cancer is not against the manifest weight of the evidence. Put another way, the ALJ's finding is sound.

Since a *prima facie* case of discrimination was established, we advance to step two of the analysis—whether the employer has articulated a nondiscriminatory reason for its action.

Both the ALJ and the Commission found that the vague references to complaints against the spa and Johnson's rudeness did not rise to the level of an articulated reason for dismissal. Perhaps most significant is the fact that neither of the two agents of the employer admitted making the decision to dismiss Johnson. Though Rottman and Gouletas were in a position to make the decision to dismiss Johnson, they both denied doing it and were, therefore, unable to articulate any legitimate justification for terminating Johnson's employment.

There was no response to Johnson's *prima facie* case of discrimination. There was no need for her to go any further. Her discrimination case was complete.

We acknowledge that the Commission's final order contains some misstatements about the evidence. Salberg no longer was employed by Lake Point and did not testify at Johnson's hearing. There are two references in the Commission's final order, however, to Salberg's "testimony" that Rottman knew about Johnson's condition.

These two statements, though erroneous, do not lead us to find the Commission's conclusion is against the manifest weight of the evidence. The ALJ's recommendation and determination, adopted by the Commission, clearly indicate it was Johnson who testified that Salberg told her Rottman was aware of her cancer. Although this was hearsay, the ALJ did not rely on hearsay to conclude Rottman's and Gouletas' claims of being unaware of Johnson's condition were not credible. There was ample other evidence to support the finding.

The Commission's final order entered in Johnson's favor was not against the manifest weight of the evidence.

### 3. Should the Amount of Damages Awarded be Reduced?

■ As its final issue, Lake Point contends that certain elements of damages awarded by the Commission should be eliminated or reduced. Specifically, Lake Point contends Johnson failed to produce sufficient evidence to show that she sought other employment after her termination to mitigate her damages; that the physical evidence Johnson produced to establish the amount of insurance premiums she paid was not competent; and that attorney fees should be reduced because certain charges for telephone calls "appeared excessive."

Each of these matters was dealt with by the Commission. In *ISS International Service System, Inc. v. Human Rights Comm'n*, 272 Ill. App. 3d 969, 651 N.E.2d 592 (1995), a complainant's testimony was sufficient to establish damages, the employer bearing the burden of proving that an employee failed to mitigate damages. It was not against the manifest weight of the evidence for the Commission to have accepted Johnson's testimony regarding the efforts she made to secure employment.

With regard to the insurance premiums, Johnson testified about the amounts paid. In addition she produced three checks, two of which were drawn from her live-in boyfriend's account. We do not find it against the manifest weight of the evidence for the Commission to have accepted Johnson's testimony as proof of this element of damages.

The last objection is to the award of attorney fees. We note, however, the ALJ specifically reviewed exceptions raised by Lake Point regarding charges for phone calls and found that "several of the calls were to opposing counsel. If [the call] were shorter than the reported time, it should have been a simple matter for Respondent to produce its attorney time sheets to contradict the claimed amounts. No such time sheets were produced."

On appeal, Lake Point, once again, makes no effort to show why the billing for phone calls is inappropriate, but merely claims they

"appear excessive." Vague speculation provides no basis for this court to say the Commission's judgment as to damages was against the manifest weight of the evidence.

## CONCLUSION

We agree with the Commission's determination that a person diagnosed with cancer is "handicapped" within the meaning of the Illinois Human Rights Act. The Commission did not err in finding that Johnson established a *prima facie* case of discrimination. This created a presumption of discrimination that was not overcome by Lake Point since it failed to articulate any reason for Johnson's termination. The Commission's finding that Johnson was discriminated against based on a physical handicap was proper and the amounts awarded for damages and fees are affirmed.

Affirmed.

McNAMARA and BURKE, JJ., concur.