JEROME WILHELM, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (2nd Division)   No. 1—00—0645

Opinion filed July 31, 2001.

Steven P. Schneck, of Robert D. Allison & Associates, and Aram A. Hartunian, of Aram A. Hartunian & Associates, both of Chicago, for petitioner.

James E. Ryan, Attorney General (Paul Racette and Carol A. Cera, Assistant State's Attorneys, of counsel), of Chicago, for respondent Human Rights Commission.

Hinshaw & Culbertson, of Chicago (Tom H. Luetkemeyer, Clare E. Connor, and Timothy G. Shelton, of counsel), for respondent R.B. Hayward & Company.

PRESIDING JUSTICE CAHILL delivered the opinion of the court:
Complainant, Jerome Wilhelm, filed a complaint with the Illinois Human Rights Commission (Commission). He alleged that respondent, R.B. Hayward and Company (Hayward), discriminated against

him based on a handicap and a perceived handicap, in violation of section 2—102(A) of the Illinois Human Rights Act (Act) (775 ILCS 5/2—102(A) (West 1998)). Wilhelm alleged that Hayward discriminated against him when Hayward refused to transfer him from a drafting position to the position of foreman and later laid him off from his drafting position.

The evidence at the hearing showed that Wilhelm was hired by Hayward as a sheet metal duct installer in 1951. He was later promoted to foreman. While working as a foreman at the Amoco Building in Chicago in 1989, Wilhelm injured his neck and shoulder helping a coworker hoist a fan into a ceiling duct. He was off work for four months. His injury made it difficult to tilt his head back or raise his hands above his head. In February 1990 Hayward asked Wilhelm to perform light duty work as a draftsman because he could not perform installation work in the field. Wilhelm was paid a foreman's wage, including contributions to his union. During this period he also filled in for foremen at several sites and went to construction sites to do estimating, measuring and listing work.

The record shows that another employee, Tony Nuccio, also performed drafting work for Hayward. He was paid approximately $8 per hour and was not as proficient at drafting as Wilhelm. In the fall of 1990, Nuccio was "loaned" to another sheet metal duct installation company because Hayward did not have enough work to keep him busy. When the project at the other company was completed in January 1991, Nuccio returned to Hayward, just after Wilhelm was told there was no more drafting work available and laid off. Nuccio remained at Hayward until April 1991, when he also was laid off. The record shows that from January until April 1991, Nuccio performed mostly errands and odd jobs in the office rather than drafting work.

Hayward company policy required a doctor's unrestricted release before allowing an injured or ill employee to return to work as a sheet metal worker. Bob Kuechenberg, owner of Hayward, testified that Hayward did not consider a variation of the policy for Wilhelm.

Wilhelm testified that Kuechenberg offered him the position of foreman at Harris Bank on January 14, 1991. The foreman at Harris Bank at that time, Dan Flora, was retiring. Don Malzahn, the general manager, was present and asked Wilhelm to "sign this statement stating that [he] was 100-percent healed" before he could take the job. Wilhelm did not read the statement, but relied on Malzahn's description of its contents. Malzahn told Wilhelm that if he did not sign the statement so that he could return to work as a foreman or mechanic, he would be laid off at the end of that week because there was no more drafting work. Wilhelm told both Kuechenberg and Malzahn

that he knew he could do the job at Harris Bank, but that he would seek his doctor's opinion. Wilhelm testified that he knew he could do the job at Harris Bank without "bothering" his neck. He was familiar with the Harris Bank job because he had been a substitute foreman there several times and had also worked as a foreman at a nearby site and consulted frequently with the Harris Bank foreman. Wilhelm did not sign the statement or provide an unrestricted release from his doctor.

On cross-examination, Wilhelm admitted that in January 1991 he sent a fax to his workers' compensation attorney that stated:

"Herewith please find a copy of insurance company doctor's report. Also please be aware that R.B. Hayward general manager Don Malzahn has informed me that as of Friday I will be unemployed *unless my doctor signs a full release.* He also says that the insurance company will not pay me workmen's comp." (Emphasis added.)

Wilhelm testified that he "may have just written it wrong, worded it wrong," but that Malzahn told him he, not his doctor, had to sign a statement.

Wilhelm further testified that he had been a "nonworking" foreman at the La Salle Bank building for 10 years. "Nonworking" meant that his role was primarily supervisory and that he did not have to perform the manual labor involved in sheet metal duct installation. When he filled in as foreman during 1990 while he was restricted to light duty, he was a nonworking foreman. In his experience, it was more common to be a nonworking foreman than a working foreman. A nonworking foreman's responsibilities included: keeping timecards; supervising and instructing workers; providing proper drawings; measuring and listing ductwork; ordering ductwork; ensuring proper equipment and tools were on site; drafting; surveying; estimating; and dealing with the architects, engineers and customers. In Wilhelm's experience, the Harris Bank job was as a nonworking foreman and did not require heavy lifting above the head for long periods of time. Wilhelm also looked at the timecards of Dennis Carsello, who was hired in January 1991 as the foreman at Harris Bank. Wilhelm testified that, based on the descriptions on the timecards, he would have been able to perform all the same work.

Terry Smith, who worked as an account executive for Hayward from April 1990 to July 1991, testified that he managed the Harris Bank account during that time. He visited the site on average once a week and spent about two hours with the foreman. He never saw either Dan Flora or Dennis Carsello, foremen at Harris Bank, working with construction tools or physically installing ductwork.

Smith further testified that he discussed with Wilhelm that Maynard White, superintendent, was going to recommend Wilhelm for the foreman position at Harris Bank. White told Smith that the job did not require physical labor. At a meeting in Kuechenberg's office, Kuechenberg, Malzahn, Smith, and White agreed that Wilhelm would be a good choice for the Harris Bank position. Malzahn told them not to tell Wilhelm because he had to discuss some details with Kuechenberg. Later Smith learned that Wilhelm would be laid off because he refused to sign a release based on his doctor's advice. Dennis Carsello was selected for the job at Harris Bank. In Smith's opinion, Wilhelm was physically able to handle the Harris Bank position.

Don Wirkus, a former vice president of Hayward, testified that there was no distinction between a "working" and "nonworking" foreman. He testified that, depending on how the job at a particular site evolved, a foreman may not work with tools for a period of time, but then may be required to work with tools. Whether the foreman worked with tools also depended on how many other workers were assigned to the site.

Malzahn, general manager at the time Wilhelm was laid off, testified that Wilhelm's employment file contained conflicting doctor's notes. An insurance company doctor who examined Wilhelm for worker's compensation eligibility gave an unrestricted release, but Wilhelm's own doctor released him for only light duty. To resolve this conflict, Malzahn asked Wilhelm to provide an unrestricted release signed by his doctor. He did not ask Wilhelm to sign a release that he was 100% healed. Malzahn testified that Hayward's medical release policy existed because "there is no light duty in the field. To put somebody back that wasn't ready to go back to duty could expose the individual to additional injury [and] could expose his fellow workers to a potential injury situation." Malzahn's notes from January 17, 1991, read as follows:

> "I called Jerry into my office and asked him if he thought he could return to work without restrictions. He said no. He stated again his doctors told him he could hurt himself permanently.
>
> He also stated that he thought he could do the work down at the Harris Bank because it was a supervisory position. I told Jerry due to the volume of work and the number of people down at the Harris at this time that it was my opinion that he would be working with the tools a majority of the time.
>
> Based on his limited duty restriction, I told Jerry that we were unable at this time to place him at the Harris."

Malzahn testified that he did not make a judgment about whether Wilhelm was able to perform the job because he had no medical train-

ing. To Malzahn, light duty "usually carries with it the restrictions of lifting, reaching, [and] climbing." Malzahn did not know whether Wilhelm was unable to climb a ladder or had trouble reaching above his head. Malzahn never discussed with anyone the specific requirements of the Harris Bank job and whether Wilhelm could meet them. To Malzahn's knowledge, there were no purely supervisory positions available at that time and Wilhelm was never offered the position of foreman at Harris Bank.

Maynard White testified that the Harris Bank foreman job was 10% to 15% measuring, listing and ordering materials, and 80% to 85% installing ductwork. Wilhelm told White that he was interested in the Harris Bank job and physically able to do it. But Wilhelm had also told White that he had trouble reaching above his head and looking up because of his neck injury. White testified that Wilhelm was considered for the job but, to White's knowledge, was never offered the position.

Dennis Carsello testified that he replaced Dan Flora as the foreman at Harris Bank in January 1991. He said he unloaded ductwork and materials from delivery trucks and took them by hand truck or dolly to various floors where they were needed. He removed ceiling tiles to make preliminary measurements and then replaced the tiles. He would remove the tiles again to install ductwork. He drilled holes in the ceiling to set anchors in the concrete and then installed hangers to support the ductwork. He often performed these tasks by climbing on a ladder. Several pieces of lifting equipment were available for heavier ductwork, but depending on the configuration of the site, Carsello sometimes lifted heavy ductwork into the ceiling himself with the help of another worker. One or two men usually worked with him. Carsello spent more than half his time doing manual labor. While at Harris Bank, Carsello was injured helping coworkers lift a 300-pound coil. Before he returned to work, he provided Hayward with a doctor's release.

During rebuttal, Wilhelm testified that Malzahn never told him the Harris Bank position required work with construction tools. He also testified about the ways he managed a job as foreman to minimize and simplify the overhead work. After he was laid off, Wilhelm was examined by Dr. Loseff, who wrote a report dated March 22, 1991. The report stated: "The patient is a sheet metal worker which requires much lifting above his head which causes his discomfort." Wilhelm testified that he told Dr. Loseff he was a sheet metal worker, but did not tell him that his work required much lifting above the head. He told Dr. Loseff that he installed ductwork in the ceiling, but did not describe in detail his duties as a mechanic or foreman. He testified that Dr. Loseff may have misunderstood him.

Wilhelm also testified that, after he was laid off by Hayward, he worked for several companies as a sheet metal mechanic without difficulty. But after Wilhelm's layoff, his doctor only released him to perform "supervisory" work.

The Commission found that Wilhelm failed to prove that Hayward's policy (an unrestricted medical release before Wilhelm could return to work) was direct evidence of unlawful discrimination. The Commission also found that Hayward's stated reason for Wilhelm's layoff—that light-duty drafting work was not available—was not a pretext for unlawful discrimination. Finally, the Commission found that Wilhelm's neck and shoulder injury prevented him from performing essential functions of a foreman at Harris Bank. The Commission concluded that Wilhelm failed to prove that the refusal to transfer him violated the Act.

●1 We examine the Commission's conclusion under a settled standard of review. "As with any administrative review action, the scope of judicial review is limited. A court may not reweigh the evidence or substitute its own judgment for that of the Commission. [Citation.] The same deference is not given to conclusions of law or statutory construction. These matters are independently reviewed by the court." *Lake Point Tower, Ltd. v. Human Rights Comm'n*, 291 Ill. App. 3d 897, 902, 684 N.E.2d 948, 952 (1997), citing *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 479, 672 N.E.2d 1136, 1141 (1996).

●2 To prove a claim of employment discrimination, a complainant must show that an employer took an adverse action for unlawful discriminatory reasons. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259-60, 67 L. Ed. 2d 207, 219, 101 S. Ct. 1089, 1097 (1981); *Zaderaka v. Illinois Human Rights Comm'n*, 131 Ill. 2d 172, 178-79, 545 N.E.2d 684, 687 (1989). The court uses a three-part test: (1) the handicapped individual must make a *prima facie* case that he was qualified for the job, applied and was rejected; (2) the burden then shifts to the employer to articulate a nondiscriminatory reason for the rejection; and (3) if the employer gives a nondiscriminatory reason, the burden shifts back to the applicant to show that the articulated reason was a pretext. *Zaderaka*, 131 Ill. 2d at 178-79, 545 N.E.2d at 687.

●3 To establish a *prima facie* case of physical handicap discrimination, a complainant must show: (1) that he was handicapped under the Act's definition; (2) that the decision not to hire him was related to his handicap; and (3) that his handicap was unrelated to his ability to perform the job. *Truger v. Department of Human Rights*, 293 Ill. App. 3d 851, 859, 688 N.E.2d 1209, 1213 (1997), citing *Milan v. Human*

*Rights Comm'n,* 169 Ill. App. 3d 979, 984, 523 N.E.2d 1155, 1158 (1988).

●4 We agree with the Commission that Wilhelm was not handicapped within the definition of the Act. Under section 1—103(I) of the Act, a person who alleges handicap discrimination must show that his impairment, whatever it may be, is unrelated to his ability to do the work his employer will not allow him to do. 775 ILCS 5/1—103(I) (West 1998). "[A] complainant who cannot, by reason of a physical condition, perform the duties of the job in question even with accommodation is not handicapped within the meaning of the Act." *Harton v. City of Chicago Department of Public Works,* 301 Ill. App. 3d 378, 390 (1998).

Here, Wilhelm's neck and shoulder injury impaired his ability to tilt his head back, reach overhead, and lift heavy objects above his head. We agree with the Commission's finding that the evidence showed this impairment was related to Wilhelm's ability to perform the duties of a sheet metal duct mechanic and foreman (as Hayward defined foreman). By failing to show his impairment met the Act's definition of handicap, Wilhelm did not make a *prima facie* case of discrimination based on Hayward's failure to transfer him to the foreman position at Harris Bank.

Wilhelm argues that Hayward's policy requiring an unrestricted release from a doctor was direct evidence that Hayward imposed an unlawful "blanket restriction" and failed to make an individualized determination about his ability to perform the job of foreman at Harris Bank. Wilhelm cites *Board of Trustees of the University of Illinois v. Human Rights Comm'n,* 138 Ill. App. 3d 71, 75, 485 N.E.2d 33, 36 (1985), in which the university unfairly discriminated against the applicant, an amputee, by deciding not to hire him without first testing his agility or ability to climb, and without evidence that his handicap impaired past work performance as a sheet metal worker. The applicant's amputation happened before he began his trade as a sheet metal worker, in which he had worked nearly 20 years. The court found that the university made a "good faith but overly cautious decision after an insufficiently thorough investigation." *Board of Trustees,* 138 Ill. App. 3d at 76. He also cites *Raintree,* in which the only medical evidence submitted to the trier of fact was a doctor's note saying that plaintiff's handicap would not prevent him from performing his job. *Raintree,* 173 Ill. 2d at 483, 672 N.E.2d at 1142-43. And in *Melvin v. City of West Frankfort,* 93 Ill. App. 3d 425, 428, 417 N.E.2d 260, 261-62 (1981), as in *Board of Trustees,* the applicant had worked in a similar job since his amputation and also had passed an examination.

In this case, though Wilhelm alleges that Hayward demanded he

sign a statement that he was completely healed, the Commission found Hayward only required Wilhelm to provide an unrestricted release from his doctor in order to return to the field. The only release Wilhelm provided from his doctor (*after* he was laid off) stated that Wilhelm was released for supervisory work. Most important, the Commission found, and the record supports, the conclusion that the Harris Bank foreman position was not purely supervisory, but required the duties of a sheet metal worker from time to time. "[O]n administrative review, it is not a court's function to reweigh the evidence or make an independent determination of the facts." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88, 606 N.E.2d 1111, 1117 (1992). Wilhelm had not done sheet metal work since his injury; he had worked as a drafter for Hayward. While the record shows that Hayward never examined or tested Wilhelm's ability to perform the physical duties of a sheet metal mechanic or foreman, Malzahn testified that Hayward required a doctor's release because Malzahn was not medically qualified to judge an employee's physical ability to perform a job.

The Commission did not directly address whether Hayward imposed an unlawful "blanket restriction." Wilhelm argues on appeal that Hayward's reliance on his doctor's report that he was only released for light duty did not give Hayward the right to bar him from *all* mechanic and foreman jobs. Instead, he argues that Hayward must relate the light duty restriction to each specific job and that he could have performed the Harris Bank job under the restriction.

We may affirm on any basis that is supported by the record. *In re Application of the Cook County Treasurer*, 185 Ill. 2d 428, 436, 706 N.E.2d 465, 469 (1998). The Commission was not persuaded by Wilhelm's testimony that he could do the manual labor required of a foreman at the Harris Bank site. The Commission noted that the only medical evidence in the record was Wilhelm's doctor's note that he was only released to perform supervisory work. Though Wilhelm presented rebuttal evidence that he was able to perform manual labor in jobs he took after the layoff from Hayward, it was the Commission's task to evaluate and weigh conflicting evidence. *Lake Point Tower*, 291 Ill. App. 3d at 902, 684 N.E.2d at 952. In this case the Commission clearly gave greater weight to the evidence available to Hayward at the time Wilhelm was laid off. The facts of this case are distinguishable from those in the cases cited by Wilhelm in which there was evidence *before* the alleged discriminatory act that the applicant either passed a physical exam (*Melvin*, 93 Ill. App. 3d 425, 417 N.E.2d 260), was released by a doctor (*Raintree*, 173 Ill. 2d 469, 672 N.E.2d 1136) or had performed similar jobs despite his handicap (*Board of Trustees*, 138 Ill. App. 3d 71, 485 N.E.2d 33).

We believe Hayward's policy requiring an unrestricted medical release from a doctor before returning an employee to sheet metal installation work is not a "blanket restriction." There were only two kinds of positions open: sheet metal worker and foreman. Both required physical labor. The record shows that Hayward had a note from Wilhelm's doctor that he was restricted to light duty. Hayward had asked for an opinion from Wilhelm's doctor that he was sufficiently recovered to perform all types of manual labor required in sheet metal duct installation. We do not find support for Wilhelm's argument that Hayward should have conducted its own examination of his physical capability. An employer need only inquire whether the handicapped applicant can perform the job he is applying for. *Board of Trustees*, 138 Ill. App. 3d at 75, 485 N.E.2d at 36. The manner in which an employer conducts this inquiry has not been prescribed by the Act or by case law. An employer is not required to transfer or retain an at-will employee who is medically unable to return to his original job. *LaPorte v. Jostens, Inc.*, 213 Ill. App. 3d 1089, 1093, 572 N.E.2d 1209, 1212 (1991); *Fitzpatrick v. Human Rights Comm'n*, 267 Ill. App. 3d 386, 392, 642 N.E.2d 486, 491 (1994). We find no discrimination in Hayward's policy requiring an employee's own doctor to assess the employee's physical condition and provide an unrestricted release.

●5 Addressing Wilhelm's discrimination claim based on Hayward's decision to lay him off from the drafting position, the Commission found that Wilhelm made a *prima facie* case of discrimination. But the Commission then found that Hayward's explanation for the layoff—that there was no more drafting work available—was not a pretext for unlawful discrimination. We agree. The record showed that Hayward did not hire a replacement draftsman. Nor was there evidence that Nuccio's return to the office was anything but coincidence. Nuccio was not a proficient draftsman, and the testimony showed that he performed mainly office errands until he was laid off in April 1991, just three months after Wilhelm. The Commission's finding was not against the manifest weight of the evidence. 775 ILCS 5/8—111(A)(2) (West 1998).

We affirm the order of the Human Rights Commission.

Affirmed.

GORDON and McBRIDE, JJ., concur.